# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00086-CV

---

**A. L. G. A. and W. F. A. M., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 395TH DISTRICT COURT OF WILLIAMSON COUNTY**
**NO. 17-0150-CPS395, THE HONORABLE RYAN D. LARSON, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

A.L.G.A. (Mother) and W.F.A.M. (Father) appeal from the trial court's order terminating their parental rights to their children Wayne, born in February 2008; Judy, born in February 2011; Kate, born in August 2015; and Matt, born in September 2016.[1] In a bench trial held in January 2019, the trial court found that termination was in the children's best interest, *see* Tex. Fam. Code § 161.001(b)(2), and that Mother and Father had placed the children or allowed them to remain in surroundings that endangered them, *see id.* § 161.001(b)(1)(D); engaged in conduct or placed the children with someone whose conduct endangered the children, *see id.* § 161.001(b)(1)(E); and failed to comply with a court order that established actions necessary to regain custody of the children, *see id.* § 161.001(b)(1)(O). The court further determined that

---

[1] We will refer to the children by pseudonyms. *See* Tex. R. App. P. 9.8. Father is the father of Wayne, Judy, and Matt. The rights of Kate's father, whose identity is unknown, were also terminated, but he is not a part of this appeal.

Mother had a mental illness or deficiency that made her unable to provide for the children, *see id.* § 161.003, and that Father had used a controlled substance in a manner that endangered the children and had either not completed a treatment program or, after completing such a program, had continued to abuse a controlled substance, *see id.* § 161.001(b)(1)(P). On appeal, both parents challenge the best-interest determination. Mother also challenges the statutory grounds, asserts that her due process rights were violated because the Texas Department of Family and Protective Services did not provide adequate language translation throughout the underlying proceeding, and argues that the Department did not make reasonable efforts to provide services to Mother. We affirm the trial court's order of termination.

## STANDARD OF REVIEW

To terminate a parent's rights to their child, the Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to a statutory ground for termination and that termination is in the child's best interest. *Id.* § 161.001; *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is proof "that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In reviewing the sufficiency of the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

In evaluating the legal sufficiency of the evidence, we look at "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have

2

formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *Williams v. Williams*, 150 S.W.3d 436, 449 (Tex. App.—Austin 2004, pet. denied). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and will "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *J.F.C.*, 96 S.W.3d at 266. Our review does not require that we disregard undisputed evidence contrary to the determination. *K.M.L.*, 443 S.W.3d at 113. If after viewing the evidence in the proper light, including undisputed evidence that does not support the findings, we conclude that no reasonable factfinder could have formed a firm belief or conviction that the Department carried its evidentiary burden, we will hold that the evidence is legally insufficient. *J.F.C.*, 96 S.W.3d at 266; *Williams*, 150 S.W.3d at 449. In considering the factual sufficiency, we consider the entire record and ask whether the "disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *J.F.C.*, 96 S.W.3d at 266. If the disputed evidence that could not be credited in favor of the finding is so significant that a reasonable factfinder could not have formed a firm belief or conviction as to the truth of the Department's allegations, we will hold that the evidence is factually insufficient. *Id*.

## FACTUAL & PROCEDURAL SUMMARY

In September 2017, the Department filed its original petition seeking conservatorship of Matt, who was a year old, after it received referrals on August 30 and 31 alleging physical abuse and physical and medical neglect by Mother and after a pediatric surgeon refused to discharge Matt into Mother's care. An affidavit by Department supervisor Natalie Kramer was attached to the petition. Kramer averred that Matt was significantly

developmentally delayed, had been hospitalized multiple times for feeding issues, and had a feeding pump and a G-tube or G-button installed.[2] Those devices had been inserted because Mother had reported that Matt "aspirates and vomits when being fed by mouth."

The affidavit further stated that Mother had recently brought Matt to the Dell Children's Hospital emergency room for the fourteenth time,[3] asking that he be admitted and that she and her other children be given a room at the Ronald McDonald House. However, hospital staff "do not ever observe the infant to have the same issues" Mother would report during the frequent hospital visits. Staff told the Department that Mother "continues to report making the child's condition worse than it is" and that "[t]here is worry that mother is having the child undergo surgery and medical test unnecessar[ily]." In addition to the fourteen visits to Dell Children's Hospital, Mother had brought Matt to another emergency room three times in the last month, "[e]ach time with concerns that mother reports that no other medical professional witnesses." The Department further received a report that Mother had thrown away Matt's G-tube and feeding pump, which had been provided five days earlier, and that insurance would generally only approve a new one every five years. The Department's affidavit stated that Mother's living situation was unstable and that there were concerns that Mother was homeless and was seeking Matt's repeated hospitalization so that she could stay at the Ronald McDonald House. However, the affidavit explained, the Ronald McDonald House would no longer accept Mother because of her frequent requests to stay there, "along with asking for money, food, and gas money while she is there despite . . . having food stamps."

---

[2] In this record, "G-tube" and "G-button" seem to be used interchangeably to refer to a gastrostomy tube, which is a medical device placed through the patient's abdomen into his stomach, allowing nutrition and medication to be delivered directly to the stomach.

[3] The affidavit does not state the time frame during which those visits occurred.

4

The affidavit stated that the Department was involved with the family due to "significant mental health concerns" about Mother, who is an undocumented immigrant, had been both victim and perpetrator of domestic violence with Father, and had been diagnosed as bipolar. The affidavit further stated that Mother suffers from severe depression, that she had a history of suicidal and homicidal ideations, and that "[t]here is an ongoing worry that she fails to maintain her medication to treat her mental health concerns." Father is also an undocumented immigrant who had been deported in 2014 due to allegations of domestic violence against Mother and had since returned and was believed to be living in Dallas.

The affidavit recited the Department's history of involvement with the family, saying it had been working with the family "nonstop" since May 2012, "with only two short breaks of case closures." The first referral, alleging neglectful supervision by Mother, was received in mid-2012—the children were removed after Mother said she was depressed and had suicidal thoughts and then later were returned to her care. In late 2013, the Department received another report of neglectful supervision, as well as an allegation that Wayne had been sexually assaulted—the investigation closed in early 2014, and at its conclusion, the children were allowed to stay with Mother. In August 2015, the Department received a report that Mother went "for periods of time with untreated Depression and Bi Polar"—that investigation closed in January 2016. Six months later, the Department received a report alleging: physical neglect by Mother and Father; that Mother left the children with a friend while she went to Dallas for work, during which time the friend's husband attempted to molest Judy; and that Mother had assaulted Father. That case remained open until a Family Based Safety Services case was opened in 2017. In June 2017, the Department received an allegation of medical neglect stating that Mother had refused to feed Matt "because she reports that he would throw up every time she fed him," that

5

medical professionals did not observe the swallowing issues reported by Mother, and that Mother "insisted that [Matt] be hospitalized, despite no medical need." That case was closed because the family was already "involved with Family Based Safety Services."

The Department received the most recent referrals in late August and early September 2017. In October 2017, the Department filed an amended petition seeking conservatorship of the three older children as well. The Department explained that concerns had arisen during its investigation into the allegations related to Matt; that since Matt's removal, the Department had "continue[d] to receive ongoing concerns by all those who interact" with Mother and her children; that Mother had refused to cooperate with the Department's safety plan or its efforts to offer her services; and that since Matt's removal, there were concerns that "one of the other children may be at risk of [Mother's] exaggerating a medical condition to gain resources and housing while that child is hospitalized."

In its January 2019 bench trial, the trial court heard testimony from both parents, hospital social worker Rachel Union, therapist Yolanda Moreno, Department supervisor Natalie Kramer, therapist Lisa Peterson, Department investigator Justin Vavra, Department caseworker Laisdy Sparks, psychiatric nurse practitioner Katherine Brinkmann, the children's court-appointed special advocate (CASA) Whitney Piedfort, and several other witnesses.

The Department introduced into evidence some of Matt's medical records, in which hospital personnel expressed significant concerns about Mother's care for Matt because she was confrontational and irrational and gave reports that conflicted with medical observations. The records reflect that Mother had difficulty understanding Matt's medical issues—hospital staff did not know whether it was due to a lack of knowledge or an unwillingness to accept the information. By the time Matt was a year old, Mother had already been given three feeding

6

pumps because they kept being "thrown away" by Mother or others in the household. Further, during some hospital visits, Mother denied that Matt had had bowel movements or wet diapers, but nurses found wet or dirty diapers concealed in the trash. One note said, "Mom is interfering with her son's care. Social work has been working with CPS and been make [sic] aware of her hiding wet diapers."

Rachel Union testified that she was involved in arranging housing and other services for the families of patients at Dell Children's Hospital. She said that she eventually became "suspicious" about Mother's seeking assistance "because the information she was providing kept changing." Union came to believe that Mother "had another motive, other than truly being homeless," but Union never knew what that motivation might be. Union further testified that Mother "frequently presented with concerns that the child was vomiting, and none of us had witnessed the child vomit." When medical staff attempted to test Matt's tolerance for taking food by mouth, Mother interfered, feeding him via his G-tube before staff could give him a bottle. Union had concerns about Mother's interactions with her older children as well, saying that Mother got frustrated and impatient and sometimes seemed unresponsive when one of her younger children was hurt by a sibling's aggressive behavior. She said Mother "kept coming in and things kept developing, and then I kept seeing the actions between the children and with her, and then taking [Matt] to seek care elsewhere and talking to other people in the hospital about his care . . ., then I became very concerned about her ability to care for the children." Mother once told Union that her phone had been dropped in a bucket of water by her then-two-year old while Mother was sleeping all day, raising Union's concerns about Mother's ability to supervise the children. Finally, Union testified that Mother had told her that she had bipolar disorder but was not taking her medication because it made her tired.

7

Caseworker Laisdy Sparks testified about the medical issues of the three oldest children. She explained that Matt "was initially diagnosed with failure to thrive, and because of that, he has—has a lot of developmental delays." He has a G-tube "where he receives the majority of his feedings," and he needs speech, occupational, and physical therapy, as well as a number of medical specialists. When the Department took Matt into custody at about a year old, he could not sit or crawl. Since his removal, he had learned to walk and was beginning to speak, he was "[a]lmost on track" developmentally, and he was "happy and content and doesn't seem to be in any type of distress." When Judy first came into Department care, her development was so delayed that there were concerns that she was intellectually disabled, but testing shows she has an IQ "in the 80s," which is in the low normal range. Sparks testified that since her removal, Judy takes medication for ADHD, she no longer has the same level of tantrums at school or at home, her reading levels and social skills had "increased tremendously," and she was passing her classes. Medical testing conducted after the children's removal showed that Wayne has fatty liver disease—Sparks testified that Mother knew about Wayne's liver disease before the removal but neglected to tell the Department. Because of his liver disease, Wayne has specific nutritional and dietary needs, and since his removal, Wayne had been losing weight and his health has improved. Doctors have reported that the disease will "go away completely" if he continues to eat well and lose weight, but if he were to return to his old diet, his disease could return and could eventually lead to autoimmune hepatitis.

Sparks testified that Judy and Wayne had been placed together in their foster home and that both children had shown improvements in school and at home and were in ongoing "trauma-based therapy." Kate was in a different foster home from her siblings, the same home in which she was placed at the beginning of the case. She was not yet old enough for

school and did not need therapy or special assistance. Matt was in a specialized placement where his foster parents have medical training and the ability to care for a child with special needs. Sparks testified that all three of the foster homes were "long-term placement[s]" that could be permanent and that the children were all thriving in their placements.

Sparks described Mother's behavior throughout the case as erratic, disruptive, and hostile. Mother seemed to have difficulty understanding and following the rules related to visitations, such as bringing items she had been told were not allowed or disrupting Father's visits. She would come to Department offices without having made an appointment, and "there have been times when [Mother] tells stories, and her stories are not consistent with, like, reality and, like, what really happened." Sparks also said that when Mother "gets angry, . . . she can be a little scary." Sparks testified that she had tried to text with Mother and Mother's attorney to communicate because she did not want her "words to be twisted." Sparks testified that she was fluent in Spanish, that Father never complained about her Spanish, and that she and Father did not have difficulty communicating. Sparks did not believe Mother had trouble understanding Sparks's Spanish and said that Mother sometimes spoke to her and the children in English.

Sparks testified that Mother was generally appropriate in visits and was always eager to see her children. The children were likewise always happy to see her and sad when the visits were over. Mother could explain most of the children's various needs to Sparks and had complied with many of the requirements set out in the court order. However, Sparks explained that the Department's concerns about Mother's parenting abilities are related to her suicidal and homicidal ideations, her suicide attempt, and her temperament, noting that Mother assaulted Father's then-girlfriend while the case was pending, had become confrontational with foster parents, and had repeatedly disrupted Father's visitations. Further, Mother's living situation had

been unstable throughout the case, and Mother had continued to bring unhealthy food to her visits, which is particularly dangerous for Wayne due to his liver condition.

Sparks testified that although Father had largely complied with the requirements placed on him, he had not abstained from illegal substances. Sparks explained that all six of Father's random urinalysis drug tests were negative but that he tested positive for cocaine in three hair follicle tests taken in March, July, and October 2018. In those tests, the level of cocaine steadily decreased, and a test taken shortly before trial was negative for all substances. However, Sparks referred to an "advisory" filed with the trial court that stated that it was the opinion of Marco Quesada, the Department's "subject matter expert in substance abuse," that the March test detected use from mid-December 2017 to mid-March 2018 and that the July test showed use from late March 2018 to late June 2018. Quesada concluded "that the cocaine use was not a onetime event, as these two drug tests capture two different time frames and do not overlap." Similarly, Sparks said, the October drug test indicated continued drug use. However, Sparks testified that she never had any concerns that Father had been drinking or using drugs before his visitations.

Sparks testified that during Father's visitations, he was playful and attentive, behaved appropriately, and brought healthy food and drinks for the children. She said the children are always happy to see Father and that they "care for their dad and the feeling is mutual with Dad." Father was never uncooperative or disruptive, and Sparks did not have any issues with him doing his services. Although Sparks testified that Father had not paid court-ordered child support, she agreed that he had been "providing financially for the children" and that he brought food, clothes, toys, money, and other gifts to visits. He had obtained an apartment, shown stability in his employment and housing, completed a psychological evaluation and

therapy, completed parenting classes, passed his urinalyses, notified the Department when Mother tried to contact him in violation of the court order, and contacted Sparks throughout the proceeding to check on the children and their medical needs. Nonetheless, Sparks testified that the Department "has concerns about [Father's] plan for day care," because of its "concerns" about Carmelita Gonzales, the person Father planned to use for care and the same woman with whom Mother lived for much of the proceeding. The Department had done a home study and determined that Gonzales's house would not be an appropriate foster placement. However, Sparks agreed that Gonzales did not have a criminal history and that she worked at a certified day care facility where Father intended to place the children, rather than in Gonzales's home.

Sparks did not think Father fully understands Matt's or Judy's needs and she believed he would have difficulty meeting Matt's medical needs as a single father working six days a week. She explained that day care centers generally cannot accept children with Matt's needs because they are not qualified to care for him. Sparks noted that Father "wasn't able to express or verbalize the individual needs of each child," although she also admitted that she had needed a list to be able to testify as to all of Matt's medical conditions. She further agreed that if Father regained custody, he would be able to get nursing assistance from the State for Matt.

Department supervisor Natalie Kramer testified that Mother had twice completed her offered services but never changed her behavior as a result. She said that the Department had concerns about Mother's mental health and parenting abilities in part because Mother had progressed from having suicidal thoughts to making a plan to attempting to carry out that plan. Kramer further testified that Mother's suicidal tendencies seemed to occur when "she's overwhelmed and left with the children because Dad was either deported or gone or she just has the kids and she's unstable and depressed."

11

Whitney Piedfort testified about Wayne's health and educational improvements since being placed in foster care and about Judy's improvements in school and the management of her ADHD. She said that both of the older children were in therapy and were working through their past trauma. Piedfort further testified that one of the main concerns throughout the Department's involvement with the family was "the unstable housing and the constant moving" and that "the number of times that [Wayne and Judy] moved schools by the time is abnormal for a child that needs consistency." Asked why she recommended termination instead of permanent managing conservatorship, Piedfort said that "with a PMC, my concern that there's still a limbo of what's going to happen" and that "my concerns is that nothing is going to necessarily change" because the family had been offered services before with little positive effect. She was concerned that Mother would not be able to meet all of the children's various needs and that she was not stable, either with her mental health or with her housing. She was also troubled that Mother did not tell the Department about Wayne's liver disease, leaving the Department to discover it on their own. As for her concerns about Father, Piedfort said:

> For Dad, the drug concern is probably the biggest piece for me. Throughout the duration of the case, there have been three different positive drug tests. Dad is a fun dad. He—the kids do love him. There's no doubt about that at all. But the— for the duration of the case, when you have three positive drug tests, that's not putting your child first and ensuring that they have a stable, safe place to be able to thrive. Dad has testified to the fact that his plan for childcare is to place [them with Carmelita Gonzales], who CPS has already ruled is not a fit placement. So even just the judgment call of that is a concern, that he feels that is an appropriate placement.

Piedfort testified that Wayne, "at this point, he just wants an answer. He wants something to be final. He needs a permanent place of knowing 'Hey, this is what's going to happen.'" Piedfort said that Wayne loves his parents but understands that he might be adopted

12

as part of the Department proceeding and that when he was told of the possibility of adoption by his current foster family, "he expressed being very excited" and "talked about being excited about his last name being changed to theirs." She further testified that Matt had made significant physical strides since being removed from his parents' care, going from "developmentally the age of a four-month-old" to being "caught up to where a two-year-old should be." Matt's foster family was working on his swallowing issues, with the intention that his feeding tube would be removed at some point, and Piedfort testified that Matt was very happy and loved to play. Kate, who does not have special needs, had bonded with her foster home and had never asked for Mother, only for her grandparents and, after visitations had begun, Father. Piedfort testified that the three foster families were working together to maintain the sibling connection and that all the placements had given the children "the stability, the support that they have received, the ability to get them to the appointments and the therapies that they have needed . . . ."

Father testified that he came to the United States legally in 2006 or 2007 but did not appear for a permit hearing and therefore became subject to a deportation order. He was deported under that order in 2011 due to domestic violence reported by Mother.[4] He returned illegally in 2013 or 2014, initially living in Dallas for several months "to avoid problems with the mother. I did not want to come straight to Austin until everything was clear." He returned to Austin after about six months, working for the same employer for whom he had worked before his deportation. Father works in construction and usually works six days a week, eight to ten hours a day. He testified that his employer was fairly flexible and supportive of his employees if they have family situations that require them to leave early.

---

[4] Mother and Father each testified about the domestic-violence report. Mother testified that Father had grabbed her by the throat when he was intoxicated, while Father testified that Mother had lied in claiming he had assaulted her.

Father said he did not know about Matt's repeated hospitalizations because Mother did not inform him, and he insisted that he had only used cocaine once and had never used other illegal drugs. Father testified that early in the proceeding, Mother had assaulted his then-girlfriend, Leslie, giving her a black eye. He also testified that Mother had at least once assaulted him. At the time of trial, he was dating a woman named Nancy, who is a legal resident and not at risk of being deported. Although Mother had sent Nancy texts disparaging Father, she had not threatened or assaulted her.

Father said that throughout the proceeding and his completion of services, he had come to realize that he had mistakenly focused on supporting Mother, as the children's mother and primary caregiver, rather than on the children themselves—"my mistake was to trust in her, to trust that she will take care of the kids and that she will do everything for the kids and I will just provide for them." He had learned to be more involved and to place them first. Father testified that the Department had placed the children with him for about six months in 2014 before returning them to Mother's care and that the Department never expressed any concerns about his caring for the children. He admitted that he did not see the children very much after they were returned to Mother because he was working long hours and because he has problems with Mother, explaining, "It's very difficult to talk to her. And she will tell me that she would rather give the kids to someone else than for me to have them."

Father testified that if he regained custody, Nancy could provide daytime care for the children, and that if he were to be deported again, his aunt in Dallas would care for the children. Father did not know what grades his eldest children were in and could not give full answers when asked about the children's medical issues, but he asserted that he had been asking the doctors but had not been given that information. Father admitted that he had never been to

the children's schools, attended any parent-teacher conferences, or attended any of Matt's medical appointments, saying he would work and Mother would handle all issues related to the children. When asked about Judy's medical issues, Father said, "Well, they say that, you know, she's got an illness, but what I think is that she just wants attention."

Mother testified, disputing much of the testimony by Father and the Department's witnesses. Mother asserted that Sparks did not speak fluent Spanish when communicating with her and that Sparks would text her in English. She further said that Sparks had been unfair to her, had been slow in responding to Mother's requests or questions, and had told her she had "already lost her children." Mother testified that Sparks had called her a "criminal,"[5] made fun of her, and called her crazy. Mother claimed that she always informed Sparks when she moved; that she followed all of the instructions she was given at visitations; that she did not disrupt Father's visitations; and that she never interfered with Matt's medical staff or their tests. She testified that she only brought Wayne fast food once, at a time when she had not yet been told he needed to improve his diet. However, she also admitted that she knew about Wayne's liver disease before his removal, that doctors told her Wayne's diet had to change, and that she had

---

[5] The evidence includes some text messages between Mother and Sparks. Those texts were in Spanish and were translated at trial by an interpreter. At one point Sparks sent Mother a series of texts that were translated as saying: "Criminal? You are the one that is here in this country illegally, and that is criminal"; "Criminal is also when one uses an ID from someone else to obtain work"; and "criminal is when one person goes to the girlfriend of the ex-partner to beat her up." Sparks testified that she had not called Mother a "criminal" in those texts, asserting:

> She mentioned something about she's not a criminal, so I . . . did it like a little mini lesson, and I explained—I just gave her . . . examples of criminal type of activity. . . . I mentioned on there that, you know, "This is criminal." And so however she felt like she needed to take—she took that, like, you know, it's how she takes things, but that's what was mentioned, you know, in the text. I just schooled her on, you know, what the word "criminal" means.

changed his diet before his removal from her care. Mother testified that she believed Father frequently drank to excess and that he had used cocaine more than once—she based that belief on having seen Father on several occasions with a cousin she believed sold drugs. Mother said that Father was lying in claiming that she had assaulted him and that Leslie had started the fight with Mother. She denied that the police had ever been called to her house because of a suspected overdose or that she had ever tried to kill herself, and she testified that she had been diagnosed with "[r]egular bipolar," not with depression or "severe bipolar."

Yolanda Moreno, Father's therapist, testified that she worked with Father for sixteen or seventeen sessions and that he was successfully released from therapy after testing negative for drugs. She said he was engaged throughout their sessions and was working to process the information he was given. She also testified that she believed he understood the children's medical needs and the negative effect domestic violence can have on children.

Lisa Peterson testified that she discharged Mother after five sessions because she believed that Mother "was telling me what she wanted to hear" and "didn't feel like she could be honest with me because she was so afraid of losing the kids." Peterson said, "I didn't feel like we were getting anywhere in our sessions, so that's why I asked to close the case." However, Peterson also explained that she does not speak Spanish, that she worked with Mother through a translator, and that Mother might have been more effective with a Spanish-speaking therapist because "they would get more work done" during their sessions. Katherine Brinkmann, on the other hand, testified that she had seen Mother over the last nine months before trial and that with each visit, Mother's behavior was calmer, "she was very stable, she was always very logical, and was showing to me that she was able to maintain her medication and be responsible with her appointments." Although Brinkmann believed Mother was currently stable, she agreed that if

16

someone had an eight-year history similar to Mother's (multiple psychiatric hospitalizations, six years of Department involvement, unstable living situations, and multiple domestic partners), "the stability is threatened."

## DISCUSSION

In her first issue, Mother asserts that the evidence is legally insufficient to support the trial court's order of termination. Mother notes that it took three months to set up therapy appointments with an interpreter and argues that Sparks was "openly hostile" and called Mother "a criminal because of her status as an immigrant in this country"; that "[i]t's not believable that anyone would be able to satisfy a caseworker with those kinds of attitudes, no matter what the parent in question did"; and that "it might be almost impossible to cooperate with the Department." She concludes by stating that "the evidence that she could actually do services is legally insufficient" and, therefore, that "the legal basis for termination is insufficient."

Mother's argument related to the statutory grounds for termination focuses on section 161.001(d), which provides that termination may not be ordered for a parent's failure to complete court-ordered services if the parent shows that she was unable to comply with specific provisions of the order, that she made a good faith effort to comply with the order, and that her failure to comply is not attributable to any fault on her part. *See* Tex. Fam. Code § 161.001(d). However, the trial court found termination was justified on grounds other than Mother's failure to comply with the court's orders—it also determined that Mother had placed or knowingly allowed the children to remain in surroundings that endangered their well-being, that she engaged in conduct or knowingly placed the children with someone who engaged in conduct that endangered their well-being, and that she suffered from a mental illness or mental deficiency that

17

rendered her unable to properly care for the children. *See id.* §§ 161.001(b)(1)(D), (E), .003. The only portion of Mother's argument that notes the other grounds for termination states:

> In this case, it strains credibility to argue that the trial court found that the Appellant could have reasonably completed her services, thus ameliorating the (D) and (E) grounds, negating the (O) ground, and somehow getting around the Department's insistence that the Appellant was mentally defective under § 161.003.

Mother's brief does not explain how the evidence cannot support the court's conclusions that she engaged in conduct that endangered the children or placed them with others who endangered their well-being, that she placed them in surroundings that endangered their well-being, or that her mental illness renders her unable to provide for her children's needs. *See* Tex. R. App. P. 38.1(i). Nor does our review of the record support such a determination. We overrule Mother's first issue on appeal. *See In re J.A.M.R.*, 303 S.W.3d 422, 425-26 (Tex. App.—Dallas 2010, no pet.); *In re C.L.*, No. 04-03-00638-CV, 2004 WL 86136, at *3 (Tex. App.—San Antonio Jan. 21, 2004, no pet.) (mem. op.); *In re B.M.R.*, 84 S.W.3d 814, 816 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

In her third issue, Mother asserts that the termination of her parental rights violated her fundamental due process rights because she did not receive adequate language translation during the underlying proceeding. She complains that she "did not have adequate translation through the entire case," that she had trouble understanding her caseworker, that "it's not clear she had the help she needed in the Family Based Safety Services case, because the supervisor thought she spoke English," and that there "is no evidence that was ever remedied." However, Mother's assertion that it is "not clear" whether she was adequately served by the Family Based Safety Services case cannot suffice to establish a due process violation. *See, e.g.,*

18

*Castro v. Ayala*, 511 S.W.3d 42, 46-47 (Tex. App.—El Paso 2014, no pet.) (person asserting due process violation has burden to establish violation, and whether person sufficiently understands proceedings is generally fact question).

Further, although Mother asserted at trial that she had difficulty understanding Sparks, Sparks testified that she was fluent in Spanish, that she did not believe that Mother had failed to understand her, and that Father did not have difficulty understanding Sparks's Spanish. In the exhibits introduced at trial, Mother did not express any trouble understanding Sparks's Spanish texts. Whether Mother sufficiently understood throughout the underlying proceeding was therefore a fact issue for the trial court to consider. *See In re L.M.I.*, 117 S.W.3d 1, 4 (Tex. App.—Houston [14th Dist.] 2001), *aff'd*, 119 S.W.3d 707 (Tex. 2003) (whether father sufficiently understood affidavit of relinquishment was fact issue and it was thus within trial court's discretion to determine whether absence of interpreter violated due process rights).

Finally, other than soliciting conflicting evidence about her comprehension of English, Mother did not raise due process complaints in the trial court. *See In re L.M.I.*, 119 S.W.3d at 710-11 (father did not raise issue related to lack of translation services before trial court); *In re F.E.N.*, 542 S.W.3d 752, 768 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (father waived complaints related to lack of translator during some preliminary proceedings or "subpar" translator at termination hearing because he did not object to Department's failure to provide translator during its interactions, lack of translated family service plan, or competence of translator provided at trial); *see also In re B.L.D.*, 113 S.W.3d 340, 352-54 (Tex. 2003) (general rule requiring trial-court preservation of due process complaints applies in parental termination cases). We overrule Mother's third issue on appeal.

Mother's fourth issue argues that because the Department did not make reasonable efforts to provide services, termination was inappropriate. However, this issue goes to whether Mother could prove that her failure to complete services was not attributable to her under section 161.001(d) of the family code, which allows a parent to show she should be excused from having complied with court-ordered services and therefore to avoid termination under section 161.001(b)(1)(O) only. *See* Tex. Fam. Code § 161.001(d). We have already noted that the trial court found termination was proper under three other statutory grounds separate from section 161.001(b)(1)(O). We therefore need not consider Mother's fourth issue.

Lastly, we turn to whether the evidence is insufficient to support a conclusion that termination is in the children's best interest, an argument raised by both parents.[6]

We review a trial court's best-interest determination in light of the considerations set out in *Holley v. Adams*, taking into account the children's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the children, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the children's best interest, plans for the children's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child."

---

[6] Mother asserts that the evidence is factually insufficient, while Father asserts that it is both legally and factually insufficient.

*In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The children's need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs. *L.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the children might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the children's best interest. *See L.R.*, 2018 WL 3059959, at *1.

Little testimony was presented about the children's wishes, other than testimony that the children have bonded with their foster parents and are thriving in their care and that Wayne is very excited about the prospect of being adopted by his foster parents, the same foster family with which he and Judy were placed in a past Department intervention. *See M.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.) (factfinder may consider that child has bonded with current placement, is well cared for by them, and has spent minimal time with parent). Three of the four children have medical needs, Matt's being the most serious. Matt is in a medically trained foster home, and Wayne and Judy are both placed with foster parents who have addressed and continue to address their medical needs, adjusting Wayne's diet and ensuring that Judy has ADHD medication and appropriate support for her intellectual functioning. Sparks and Piedfort both testified positively about the foster parents' parenting abilities, Matt's foster parents have arranged for home health care to assist them,[7] and the foster parents are bringing the

---

[7] We note that the in-home nursing would be available to Mother or Father if they were to regain care.

21

older two children to therapy to work through past trauma. The children's current foster placements are all stable and "long-term" and will likely become permanent.

The Department had been involved with the family on a nearly "nonstop" basis since 2012. There was testimony that Father had largely abdicated his involvement with the children's care and needs—while he was with Mother, he said that he worked and allowed Mother to handle everything related to the children, and since they split up, he had stayed away from the children because of his difficulty getting along with Mother. However, his lack of involvement meant that he was unaware of Mother's repeated hospitalizations of Matt, which medical staff believed were not always necessary. Father admitted that he had mistakenly allowed Mother to be the sole caretaker and testified that he had learned from that mistake, but that asserted change in behavior, along with his cooperation with the court-ordered services, occurred years after the Department first had to become involved with the family.

Witnesses testified that Mother was confrontational, uncooperative, and difficult to work with, and although Mother asserted that such testimony was false, we will not second-guess the trial court's resolution of credibility and evidentiary conflicts. *See A.B.*, 437 S.W.3d at 503. Mother also denied suicidal or homicidal ideations, but medical records and the Department's witnesses reflected otherwise. There was evidence that Mother was not always reliable about taking her medication, although her therapist stated that Mother's management of her medical conditions had improved in the months leading up to trial. Department witnesses and Matt's medical records indicate that Mother's conduct related to Matt's medical needs sometimes was inappropriate—losing or throwing away his feeding apparatus; interfering with medical tests that sought to confirm medical problems reported by Mother; concealing evidence that Matt was urinating or having bowel movements; and repeated emergency room visits when

22

medical staff seemed to believe at least some of those visits were unnecessary and resulted in Matt being subjected to unnecessary medical interventions. *See LaRocca v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00103-CV, 2010 WL 4367065, at *8-9 (Tex. App.—Austin Nov. 4, 2010, no pet.) (mem. op.) (in suit for termination of parental rights to medically fragile child, court of appeals discussed evidence of child's needs and which proposed placement would best meet those needs).

Father denied ongoing cocaine use, but the Department produced evidence from which the trial court could have concluded otherwise. Further, Mother testified that he had committed domestic violence, an allegation Father denied. More importantly, Father admitted that he had largely removed himself from issues related to the children, allowing Mother to be the primary decision-maker. Even after they broke up, Father continued to allow Mother to control the children's care because he found it difficult to deal with Mother. Father was removed enough from the children's day-to-day lives that he was unaware of Matt's repeated hospitalizations. Department witnesses expressed concerns about whether Father would be able to manage the children's various health issues and whether he could be sufficiently protective of their needs.

It is clear that both parents love their children and that the children love them in return. However, as noted above, the children's need for permanence is of primary consideration, a fact testified to by Piedmont in explaining why she was recommending termination. *See L.R.*, 2018 WL 3059959, at *1; *D.R.A.*, 374 S.W.3d at 533. On this record, we

23

cannot conclude that the evidence is legally or factually insufficient to support the trial court's best-interest determination. We overrule Mother's second issue[8] and Father's sole issue.

## CONCLUSION

We have overruled Mother's and Father's issues on appeal. We affirm the trial court's order of termination.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed: July 10, 2019

---

[8] Mother's argument as to best interest boils down to this: "because the mother had difficulty completing services, because of the Department's outward hostility towards her, the facts do not indicate that there was clear and convincing evidence that it was in the children's best interest to terminate their mother's parental rights." We have addressed the merits of the issue despite the lack of briefing.

24