**In the Interest of L.M.I. & J.A.I.**

No. 14–00–00447–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 18, 2001.

Shawn Casey, Houston, for appellants.

Otto Hewitt, Alvin, Emily A. Fisher, Galveston, for appellees.

Panel consists of ANDERSON, J. HARVEY HUDSON, and SEYMORE, JJ.

## OPINION

J. HARVEY HUDSON, Justice.

This is an appeal from a termination of parental rights. At the conclusion of a bench trial, the court terminated the parent/child relationship between appellants, Ricardo Antonio Duenas ("Ricardo")and Luz Maria Inocencio Duenas ("Luz"), and their twin sons and awarded appellees, Miles and Monica Montegut, managing conservatorship of the infants. In two issues, appellants allege: (1) the attorney's failure to translate the affidavit of relinquishment into Spanish violated Ricardo's constitutional right to due process; and (2) that Luz's signature on the irrevocable affidavit relinquishing her rights was pro-

cured as a result of undue influence and overreaching. We affirm.

On April 9, 1999, Luz gave birth to twin boys. The twins were born prematurely with a variety of physical infirmities that required special medical attention. The twins were the product of a sexual relationship Luz had at the age of fifteen with Ricardo, a twenty five year old man. During her pregnancy, Texas City police detective Brian Goetschius contacted Luz in response to an allegation that she was working as a nude dancer at a sexually oriented business. Upon learning she was pregnant, Detective Goetschius offered Luz his counsel and took an active interest in her well being. He drove her to several doctor's appointments and helped her apply for governmental assistance. The record reflects that on September 21, 1999, after not having any contact with Luz for an extended period, he was contacted by Luz's older sister, Esther Gonzalez. Esther asked him for assistance in placing the twins with an adoptive family. Subsequently, Esther met with Detective Goetschius's wife, Dawnell Goetschius. At their meeting, Esther and Dawnell arranged for the children to be adopted by Dawnell's sister and brother-in-law, Monica and Miles Montegut.

On September 24, 1999, Esther went to her mother's home and advised Luz that she had arranged for a married couple to adopt the twins. Esther, Luz, and their mother, Guillerma Pruitt, all testified that Esther's announcement sparked a heated argument between the sisters. Luz and Guillerma testified that Esther threatened to have Luz arrested and placed in a Texas Youth Commission facility if she refused to go through with the adoption. Esther, however, categorically denied that she threatened or coerced Luz in any manner. Moreover, all parties testified that Luz eventually agreed it would be in the chil-

dren's best interest to place them with an adoptive family. Esther then drove Luz, the twins, and Guillerma to Ricardo's place of employment, the San Luis Hotel in Galveston. After arriving at the hotel, Ricardo and Luz followed Esther, the twins, and Guillerma to an attorney's office to execute the appropriate paperwork.

Upon their arrival at attorney Mark Ciavaglia's office, Ricardo and Luz were asked to sign irrevocable affidavits relinquishing their parental rights. At trial, Ricardo testified that Luz advised him that Esther had threatened to have him arrested if he refused to sign the paperwork. Esther denied threatening Ricardo in any manner. Ricardo, a Honduran citizen, further testified that he does not understand the English language and that he did not grasp the nature or the content of the documents he was asked to sign. Once again, Esther's testimony directly conflicted with Ricardo's testimony. She testified that, "[h]e said he understood." She further testified that she believed that both Ricardo and Luz fully understood what they were doing at the attorney's office. Her account of Ricardo's comprehension was supported by Mr. Ciavaglia's testimony. He testified at trial that, "[h]e seemed to understand English and responded to questions." He further testified that while reading the affidavit to Ricardo, he repeatedly asked Ricardo whether he understood what he was saying and that Ricardo responded affirmatively.

Ricardo signed the affidavit after Mr. Ciavaglia had explained its terms. Luz testified Mr. Ciavaglia admonished her not to sign the affidavit if she had any reservations. Luz, in fact, initially refused to sign the affidavit unless the adoptive parents first agreed to send her pictures and a short summary detailing the condition, progress, and status of the children twice a year. Mr. Ciavaglia contacted the Monte-

guts, and they agreed to her demands. Mr. Ciavaglia then drafted an agreement reflecting Luz's demands. Luz then signed the affidavit. Thereafter, Luz and Ricardo surrendered the children to Mr. Ciavaglia.

The next week, Luz had a change of heart and decided to pursue legal action in an attempt to regain custody of her children. On October 1, 1999, Mr. and Mrs. Montegut filed their petition to terminate the parent/child relationship. On the same day, the court issued a temporary order giving the Monteguts custody of the children and appointed the children a guardian *ad litem.* On October 4, 1999, Luz filed a motion to revoke her affidavit. On October 17, 1999, the court replaced the children's guardian *ad litem* with another attorney. On November 17, 1999, Ricardo filed his answer to the Monteguts' petition and his counter-petition for voluntary paternity. He also filed a motion to revoke his affidavit of relinquishment. On November 23, 1999, the trial court held a hearing to determine whether the affidavits were executed involuntarily. The court held that appellants had voluntarily signed the affidavits and immediately conducted a bench trial on the Monteguts' suit to terminate appellants' parental rights. At the conclusion of the trial, the court determined the Monteguts had established by clear and convincing evidence that Ricardo and Luz had voluntarily signed the irrevocable affidavits relinquishing their parental rights and that it would be in the best interest of the children to terminate Ricardo's and Luz's parental rights. The court terminated their parental rights and awarded the Monteguts custody of the twins. At the appellants' request, the trial court issued its findings of fact and conclusions of law.

■ In their first point of error, appellants allege that Ricardo's constitutional

right to due process of law was violated by Mr. Ciavaglia's failure to translate the affidavit of relinquishment into Spanish prior to its execution. Ricardo claims that because he does not understand English, he did not understand what he was signing. He further contends the failure to provide a competent translation of the affidavit constituted a form of overreaching of such magnitude that it violated his due process rights. We disagree.

■ Due process protections are applicable in proceedings where parental rights are terminated. *In the Interest of K.R.*, 22 S.W.3d 85, 92 (Tex.App.—Houston [14th Dist.] 2000, no pet.). Ricardo's right to have the affidavit accurately interpreted in a language he understands is a matter of due process. *See Kan v. State*, 4 S.W.3d 38, 41 (Tex.App.—San Antonio 1999, no pet.) (recognizing that an accused's right to have trial proceedings accurately interpreted to a language he understands is a matter of due process). Here, a fact issue was raised in the trial court as to whether Ricardo understood sufficient English to comprehend the import of the affidavit he was signing. Thus, it was within the discretion of the trial court to determine whether Ricardo's due process rights were infringed by the absence of an interpreter. *See Baltierra v. State*, 586 S.W.2d 553, 559 n. 9 (Tex.Crim. App.1979). A court abuses its discretion if it acts without reference to any guiding rules and principles or acts arbitrarily and unreasonably. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). Here, the record reflects that both Esther and Mr. Ciavaglia testified that Ricardo fully understood the nature of the document when he signed it. We find this testimony sufficient to warrant the trial court's determination that Ricardo's due process rights were not violated by Mr. Ciavaglia's failure to provide a Span-

ish translation of the affidavit. Appellants' first issue is overruled.

■ Appellants' second issue contends that Luz's execution of her affidavit relinquishing her parental rights was involuntary and the product of coercion, duress, and overreaching. Appellants' contend that Detective Goetschius engaged in coercion and overreaching to compel Luz to sign the affidavit. Appellants further contend that the Monteguts' defrauded Luz by agreeing to her demands that she be given semi-annual updates and photographs of the twins. We reject both contentions.

■ An irrevocable affidavit of relinquishment may be revoked upon a showing of fraud, duress, coercion, misrepresentation, or overreaching. *Vela v. Marywood*, 17 S.W.3d 750, 758 (Tex.App.—Austin 2000, pet. denied). The record, however, contains no evidence to support appellants' assertion that Detective Goetschius coerced Luz into signing the affidavit or that he engaged in overreaching which rendered her execution of the affidavit involuntary. Luz testified that the detective never addressed the issue of whether she should give the twins up for adoption. Moreover, Detective Goetschius was not present when the affidavits were executed.

■ Appellants' assertion that the Monteguts defrauded Luz into signing the affidavits is equally unfounded. The burden to show involuntariness rests on the party seeking to revoke the affidavit. *Id.* Appellants failed to establish that, at the time of the agreement, the Monteguts did not intend to comply with its terms. Accordingly, appellants failed to establish an essential element of fraud. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex.1992). We overrule appel-

lants' second issue and affirm the judgment of the trial court.