Opinion issued December 11, 2014



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00495-CV

———————————

**M.M.V., Appellant**

**V.**

**TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,**
**Appellee**

On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2013-02934J

**O P I N I O N**

In this accelerated appeal,[1] appellant M.M.V. challenges the trial court's decree, entered after a bench trial, terminating her parental rights to two minor children, R.M.B. and G.R.B.

In one issue, M.M.V. contends that her "right to due process, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the Texas Constitution, [were] violated where the evidence shows she did not adequately understand the trial proceedings." More specifically, she alleges that the interpreter assigned to her case to translate the proceedings to her indigenous language was constitutionally inadequate, thereby denying her a fair trial.

Because we conclude that M.M.V. has waived this issue by failing to raise it in the trial court, we overrule her single issue and affirm.

## Background

M.M.V. appeals the ruling of the trial court terminating her parental rights to two of her children. To protect the children's privacy, we will refer to four-year-old R.M.B. as "Raquel" and two-year-old G.R.B. as "Gilberto"; hereafter, we refer to the children's mother only as "Mother."[2]

---

[1] *See* TEX. FAM. CODE ANN. § 263.405 (West 2014).

[2] In appeals involving the termination of parental rights, the Texas Rules of Appellate Procedure require the use of an alias to refer to a minor. TEX. R. APP. P.

Mother is from Guatemala. She speaks K'iche, which is a Mayan indigenous language. In 2013, she was living in a one-bedroom apartment with her husband and her three youngest children. The youngest child, Eduardo,[3] drowned in the bathtub in May of that year, when he was 10 months old. At the time of the drowning, Mother was in the kitchen cooking and listening to the radio. Eduardo had been playing with his siblings, Raquel and Gilberto, who were four- and two-years old, respectively, at the time. Mother testified that she suspected that Raquel or Gilberto must have turned on the bathtub faucet.

There had been at least two earlier investigations by Child Protective Services regarding Mother's care of her children. In one instance, Mother was carrying Gilberto in the street while intoxicated. On the second occasion, Gilberto was wandering outside of the family's apartment unsupervised and was nearly struck by a passing ambulance.

Following the drowning and death of Eduardo, Raquel and Gilberto were removed from the home. A Family Services Plan was created. Approximately one year later, the State sought to terminate Mother's parental rights.

A two-day trial was held. Mother appeared with her attorney and her K'iche interpreter. There was evidence that, at the time the children were removed from

9.8. We may also use an alias to refer to a minor's parent to protect the minor's identity. *Id.*

[3] This name is also an alias.

the home, Raquel had been malnourished and her communication skills were drastically delayed. Raquel and Gilberto each had over ten cavities that had to be filled; Raquel had to have her two front teeth pulled. Both children were behind in their immunizations. Gilberto was described as not having an individual identity; he would merely mimic his sister. Raquel did not play; she alternated between authoritarian behavior towards Gilberto and bashfulness with others. The foster mother explained that the medical issues the children had before entering her home had all been resolved under her care, Raquel had grown substantially once her diet improved, and both children had learned to play and to speak both English and Spanish while in her care.

There was evidence that Mother failed to comply with the Family Services Plan put in place while the children were under the care of a foster parent. When asked about her compliance, Mother repeatedly testified that she did "everything" or "almost everything" she was required to do. On another occasion, when asked specifically about completing her required psychosocial assessment, she refused to answer: "I wouldn't—I don't want to say nothing. No. I don't want to say anything." In closing, her counsel suggested that she did not understand all that had been required of her under the Family Services Plan.

Throughout the trial, Mother interacted with the trial court and the attorneys through a K'iche interpreter. The CPS worker testified that the same translator had

4

been working with Mother throughout the pendency of the CPS investigation, accompanying Mother to every court hearing except one and to all formal CPS meetings. The same interpreter was available to her for meetings with service providers with whom Mother had appointments under the Family Services Plan. She testified that the same translator provided translation services to Mother throughout the year preceding the trial.

At trial, Mother was asked to confirm whether she understood the questions being asked of her and the "purpose of this hearing," including that CPS was seeking to terminate her parental rights. On each occasion, she stated, through her interpreter, that she understood. At no point did her attorney object that the translator was deficient.

During closing, Mother's attorney discussed Mother's limited capacity to understand and communicate. Her closing statement is quoted below:

> The mother was never charged in this case with the drowning of the child. The—in fact, it sounds like the disposition of that case was an accident. We have a mother who has no education, who has very little access to any services when she can't read or write or even pay attention to—or be able to tell where she is on the freeway because she can't read any street signs.
>
> You heard some previous testimony that the only thing that she understood that she needed to do in the first case was the parenting class. She completed that in this case thinking that she was— completed all of her services in this case. As you've seen, trying to ask her questions during this trial, it's very difficult to communicate with her.

5

> I think the barriers are just too high trying to make sure that parents in this case understand what it is that they're supposed to do. Understand the underlying reason why the kids came into care, you throw in accident, I just don't believe that the Agency is able to meet their burden.

Counsel for Gilberto's father raised the issues of language and cultural barriers in his closing as well:

> Your Honor, I'm not very proud of my government today because I think that they've worked very little with this family because of not only the language barrier, but the cultural differences between an uneducated, uninformed parent. It's unfortunate that the children suffered physically and emotionally, but I think that the Agency could have done more to try to work with this family. These are hard working people. This lady walked over here from Guatemala, paid $7,000 to a coyote to get here to the promise land, only to have her family snatched away from her.

At the conclusion of the trial, all parents' rights were terminated. Mother timely appealed.

## Constitutional Right to Interpreter

Mother's appeal seeks to enforce constitutional provisions that guarantee criminal defendants the right to be confronted by the witnesses against him. U.S. CONST. Amend. VI; TEX. CONST. art. I, § 10. The Confrontation Clause guarantees the accused's right to be present in the courtroom during trial and to understand the testimony of the witnesses. *Baltierra v. State*, 586 S.W.2d 553, 556 (Tex. Crim. App. 1979). This right is likewise addressed in section 38.30 of the Texas Code of Criminal Procedure, which requires that an interpreter be provided to an accused

who does not understand English. TEX. CODE CRIM. PROC. ANN. art. 38.30(a) (West Supp. 2014). Thus, when a trial judge is aware that a criminal defendant has difficulty understanding the English language, the judge is required to ensure that the trial proceedings are translated into a language the defendant can understand, absent an effective waiver of that right by the criminal defendant. TEX. CODE CRIM. PROC. ANN. art. 38.30(a); *Garcia v. State*, 149 S.W.3d 135, 144–45 (Tex. Crim. App. 2004) (concerning waiver).

This was not a criminal trial. Nonetheless, constitutional rights were at stake: the natural right of a parent to the care, custody, and control of her children involves fundamental constitutional rights. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *see C.B. v. Tex. Dep't of Family and Protective Servs.*, No. 08-11-00286-CV, 2013 WL 3064405, at *8 (Tex. App.—El Paso June 19, 2013, no pet.) Accordingly, as in the criminal law context, litigants in civil proceedings to terminate parental rights are entitled to an interpreter. *See Castro v. Ayala*, No. 08-12-00142-CV, 2014 WL 1938837, at *4 (Tex. App.—El Paso May 14, 2014, no pet.). The right to an interpreter is a matter of due process. *In re L.M.I.*, 117 S.W.3d 1, 4 (Tex. App.—Houston [14th Dist.] 2001), *aff'd*, 119 S.W.3d 707 (Tex. 2003); *see Linton v. State*, 275 S.W.3d 493, 500 (Tex. Crim. App. 2009).

**Standard of Review**

Mother was provided an interpreter. When an interpreter has been appointed, the standard of review raising an issue of the litigant's ability to understand and participate at trial depends on the nature of the complaint. An attack on the competency of an interpreter is reviewed for an abuse of discretion. *Castrejon v. State*, 428 S.W.3d 179, 188 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also Linton*, 275 S.W.3d at 500 (noting that trial judge has "wide discretion in determining the adequacy of interpretive services"). "The ultimate question is whether any inadequacy in the interpretation made the trial 'fundamentally unfair.'" *Linton*, 275 S.W.3d at 503 & n. 26 (quoting *United States v. Huang*, 960 F.2d 1128, 1136 (2d Cir. 1992)).

**Waiver**

**A.    Waiver rules apply in parental termination cases**

Under the rules of appellate procedure, a party must present to the trial court a timely request, motion, or objection, state the specific grounds for the complaint, and obtain a ruling. TEX. R. APP. P. 33.1. The rules governing error preservation apply to civil cases involving termination of parental rights. *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005); *In re B.L.D.*, 113 S.W.3d 340, 350–51 (Tex. 2003) (fundamental-error doctrine does not apply to procedural preservation rules, nor does due process require appellate review of unpreserved complaints in parental

8

rights termination cases); *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (failure to assert constitutional claim in trial court bars appellate review of claim). Constitutional claims that are not raised with the trial court are not preserved for appellate review. *See In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003) (holding that father whose parental rights were terminated waived due process argument regarding inability to read his affidavit of relinquishment because he did not raise issue in trial court); *In re Baby Boy R.*, 191 S.W.3d 916, 921 (Tex. App.—Dallas 2006, pet. denied) (holding that father waived confrontation claims by failing to raise issue in parental termination proceeding).

In a termination case, "adhering to our preservation rules isn't a mere technical nicety; the interests at stake are too important to relax rules that serve a critical purpose." *In re L.M.I.*, 119 S.W.3d at 708. And "allowing appellate review of unpreserved error would undermine the Legislature's intent that cases terminating parental rights be expeditiously resolved, thus '[promoting] the child's interest in a final decision and thus placement in a safe and stable home.'" *Id.* at 711 (quoting *In re B.L.D. & B.R.D.*, 113 S.W.3d 340, 353 (Tex. 2003)).

**B.    Mother waived appellate issue**

Mother is not asserting that she was denied an interpreter. Instead, she is appealing the "interpreter's competence." This is an issue for which Mother was

required to assert a timely request, motion or objection and obtain a ruling to preserve her complaint for appeal. TEX. R. APP. P. 33.1; *see Castrejon*, 428 S.W.3d at 186–87; *Montoya v. State*, 811 S.W.2d 671, 673 (Tex. App.—Corpus Christi 1991, no pet.); *Basalo v. State*, No. 05-98-01812-CR, 1999 WL 1012971, at *3 (Tex. App.—Dallas Nov. 8, 1999, no pet.) (mem. op., not designated for publication) ("Appellant did not object at trial to the presence or the competence of the interpreter, so any possible error caused by the presence of the interpreter is waived.").

Mother admits that she did not object to the interpreter's competence. She argues, nonetheless, that she was confused and that some of her answers were "totally nonsensical" and "baffling[]." For example, when asked where her children would go to school if they were returned to her care, Mother responded, "Oh, yes. Yes, me too. I want to go to school." This elicited a follow up question asking, again, where the kids would go to school. She answered, "The school close to me." At another time, Mother was asked if she has any family members "that live in Houston." She answered, "I've got some nephews, but in a different state." On further questioning, she clarified, "Yeah. I got a nephew. Yes, I got a nephew here."

On appeal, Mother asserts that she did not understand any of the "conditional questions" posed to her, which led her to give "nonsensical"

10

responses. For example, counsel for DFPS asked her if she would agree that, if the children were returned to her, they "would be placed back in the exact same situation they were whenever they were returned or—brought into care." She responded, "Thanks. Thanks. God bless y'all. I'm—I'm nothing without my kids. I would be so happy if my kids [came] back to me." Mother argues that she misunderstood the question and believed her kids were being returned to her.

Mother testified that she has had virtually no schooling, does not write any language, and speaks only the indigenous language, K'iche. But she also agreed that all of the required services were explained to her, an interpreter had been present to make sure she understood, and she had the opportunity to ask questions. Mother testified that she understood the purpose of the trial:

| Q: | Did you understand the purpose of this hearing. |
|---|---|
| Mother: | Yes, I understand. |
| Q: | And the judge will be deciding today whether the rights to your children are cut off—are terminated? |
| Mother: | Yes, I understand. |
| Q: | And you understand that that's the purpose of all of this testimony? |
| Mother: | I understand. |
| Q; | And do you also understand that the reason why you were given services to do was to— |
| Mother: | Yes. |
| Q: | —maybe be able to keep your children? |

11

Mother:     Yeah.

Q:          And do you understand that if you don't—if you didn't complete those services, your rights can be terminated?

Mother:     Yes. I did—I did almost everything.

Q:          Just making sure you understand.

Mother:     Yes. I understand. Thank you. Thank you.

The CPS caseworker assigned to Mother's case testified at trial. She was asked whether she believed—based on her interactions with Mother over the year preceding the trial, communicating through the same interpreter—that Mother "understood what you were telling her." She answered, "Based on what she shared, yes." The CPS caseworker was specifically asked whether she was "surprised" that Mother was testifying that she thought she only had to attend a parenting class to comply with the Family Services Plan, which, indisputably, required much more. She responded that she was surprised: "It surprises me . . . throughout the [duration] of this case, there's been an interpreter. There hasn't been a breakdown in communication. So, that would be my answer. Yes, it does surprise me . . . ."

Mother's attorney raised the issue of her understanding during closing argument. Mother's closing argument, quoted above, did not state an objection to the interpretive skills of the assigned interpreter. Instead, the comments are more readily understood to address this litigant's limited ability to understand the requirements of the Family Services Plan or the causal link between parental action

12

or inaction and the State's response as it relates to child custody. *Cf. Linton*, 275 S.W.3d at 509 (affirming judgment against deaf criminal defendant who argued that interpretative services were constitutionally deficient due to her combination of deafness, lack of education, and limited communicative ability; holding that constitution required she be given interpretive services that provide "minimum level of understanding"—not "perfect" understanding—of proceedings).

The issue of the interpreter's competence was not raised with the trial court and is, therefore, waived.[4] TEX. R. APP. P. 33.1. Accordingly, Mother's sole issue is overruled.

Harvey Brown
Justice

Panel consists of Justices Keyes, Higley, and Brown.

---

[4] Mother does not assert an ineffective assistance of counsel claim based on her attorney's failure to object to the interpreter's skills.