

# NUMBER 13-21-00114-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

### IN THE INTEREST OF A.M.M., M.A.M., K.A.M., J.G.M., J.E.M., AND J.I.M.P., CHILDREN

## On appeal from the 138th District Court of Cameron County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Benavides and Silva
### Memorandum Opinion by Justice Benavides

Appellant F.M. appeals the trial court's order terminating the parent-child relationship between her and her children, A.M.M., M.A.M., K.A.M., J.G.M., J.E.M., and J.I.M.P.[1] By seven issues, F.M. argues (1) her due process rights were violated by the

---

[1] We refer to the children and their family members by their initials in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

trial court's refusal to appoint an interpreter for the entire duration of trial; (2) her due process rights were violated because a trial over Zoom prevented her from having access to her attorney throughout the proceedings; (3) the evidence was legally and factually insufficient to support termination under Texas Family Code § 161.001(b)(1)(D); (4) the evidence was legally and factually insufficient to support termination under Texas Family Code § 161.001(b)(1)(E); (5) the evidence was legally and factually insufficient to support termination under Texas Family Code § 161.001(b)(1)(O); (6) the trial court improperly terminated her parental rights because she was economically disadvantaged; and (7) the evidence was legally and factually insufficient to support a finding that termination of the parent-child relationship was in the best interest of the children. We reverse and remand.

## I. BACKGROUND[2]

The trial court called the case for a bench trial before an associate judge on August 25, September 1, and September 3, 2020.

### A. Procedural History

The Department was initially appointed the temporary managing conservator of the children on July 22, 2019.[3] On June 16, 2020, the trial court held a hearing and noted on the docket sheet that it "extended dismissal 30 days"[4] and set a permanency review

---

[2] We note that we have an obligation to ensure "as far as reasonably possible" that parental termination appeals are brought to final disposition within 180 days of the date the notice of appeal is filed. *See* TEX. R. JUD. ADMIN. 6.2(a).

[3] The dissent makes a point of saying that all of the documents filed in this case were in English. However, official court documents are required to be filed in English. Additionally, testimony from the case worker, Joanna Granado, stated that she communicated with F.M. in Spanish and that Spanish was F.M.'s primary language. Granado additionally stated that although the family service plan was in English, she explained it to F.M. in Spanish so she could understand it.

[4] No written order is found in the record memorializing the extension. Ostensibly, the trial court extended the deadline by thirty days under the Seventeenth Emergency Order Regarding COVID-19 State

hearing before final order for August 19, 2020, at 1:00 p.m. and trial for August 25, 2020, at 8:30 a.m.

On August 25, 2020, when the case was called, F.M. requested an interpreter.[5] The trial court notified her that: "If I get an interpreter here at all, it will probably just be for her testimony. I'm not allowed an interpreter though—for the course of termination trials. That's all they give me. That's the way it's been for almost 12 years, 11 years." When asked for opening statements, F.M. objected to the trial proceeding without an interpreter and through Zoom, asserting that "[she] will be deprived of her Constitutional rights under the 5th and 14th Amendment [of] the U.S. Constitution and Article 1, Section 19 of the Texas Constitution." F.M. further complained that she would not have adequate representation because she was not able to be by her attorney's side to assist in her defense. F.M. suggested the trial court could grant an extension due to extraordinary

---

of Disaster, then in effect. *See* Seventeenth Emergency Order Regarding COVID-19 State of Disaster, 609 S.W.3d 119, 120 (Tex. 2020) (permitting a trial court to "modify or suspend any and all deadlines . . . including but not limited to [§] 263.401(b) [of the family code] . . . for a stated period not to exceed 180 days"). No party objected to the extension nor challenges it on appeal.

[5] The dissent states that there was no evidence that F.M. had previously requested a translator for any of the other hearings in this case. However, the only information this Court was provided regarding any previous hearings comes from the case summary contained in the clerk's record. *See* TEX. R. APP. P. 34.5. The notes taken on the summary are from the trial court and do not document every detail of each hearing. Some of the entries just state that a hearing or day of trial occurred without more information. Therefore, we do not rely on the case summary to make any determination about the details of previous hearings. *In re Bill Heard Chevrolet, Ltd.*, 209 S.W.3d 311, 315 (Tex. App.—Houston [1st Dist.] 2006, orig. proceeding) ("A docket-sheet entry ordinarily forms no part of the record that may be considered; rather, it is a memorandum made for the trial court and clerk's convenience.").

The dissent also states that the trial court did not consider on the record if an interpreter was "actually necessary." However, although it was not directly stated, the trial court found an interpreter was necessary by providing one to F.M., although delayed. There is nothing in the record to support the dissent's suggestion that the trial court can use "surprise" as a reason to deny an interpreter.

The record before us does not indicate if F.M. had requested or received an interpreter at other hearings during the pendency of the case.

circumstances of COVID-19 "and allow [her] time to find housing for her children in order to secure their return."

The trial court overruled the objections and noted that an interpreter was not available on that day. Therefore, the trial court proceeded without an interpreter for the first six witnesses, but later located an interpreter who was brought in for the last two witnesses presented that day.

On the second day of trial, September 1, the trial court noted that the interpreter was tied up in another court. F.M. again objected to proceeding without an interpreter and without being able to confer with her attorney during the proceedings.[6] An interpreter

---

[6] When trial counsel objected prior to the beginning of the testimony on day two, the trial court responded by stating:

> You can take that up with the board of directors. That's all they give me. Okay? Or the board of judges. That's what they give me.
>
> . . . .
>
> Again, you can take that issue up with the board of judges and the referring court. If they want to give her a new trial for that reason, then they can give her a new trial.
>
> . . . .
>
> Okay. If not, you've got a whole record. Translate it, if needed.
>
> . . . .

Later, in reference to availability of court reporters and interpreters, the trial court stated:

> Same thing with interpreters. That's all I get. I've never had assigned interpreters for terminations, for trials. They are made available to me if—for the witnesses. And if they're not needed in any other court, then they're available to this court.
>
> I still have the duty to proceed with all my cases promptly, including trials. You get de novo reviews with my referring courts. So[,] the issues that you want to argue to the referring court is not necessarily the substance of the trial that's being conducted. It's the procedural resources that are made available to this court. I'll let the referring court decide whether parents in that situation are entitled to an entire new trial or not.

4

became available about halfway through the second day of trial, due to the fact that the Department had a witness that need translation. He was available for the Department's witness and for F.M.'s testimony that day.

On September 3, the interpreter returned for the third day of trial to finish translating F.M.'s testimony, but F.M. appeared late, so the trial court released the interpreter. After F.M. appeared, the trial court recalled the interpreter to interpret the remaining part of the two witnesses' testimony for F.M. and complete the translation of F.M.'s testimony. The Department called fifteen witnesses at trial; Mother did not have an interpreter for ten of those witnesses.

The associate judge ordered termination of F.M.'s rights pursuant to Texas Family Code § 161.001(b)(1)(D), (E), and (O) and found that termination was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b). On September 9, 2020, F.M. requested a de novo hearing, wherein she requested the trial court reform the associate judge's proposed order to extend the jurisdictional deadline rather than terminating F.M.'s parental rights. *See* TEX. FAM. CODE ANN. §§ 201.014, 201.015, 263.401(b). F.M. asserted that trial via Zoom did not allow adequate representation because it "precluded side by side representation" and that she was deprived of due process because "[a]n interpreter for most of her . . . trial was not provided." F.M. argued the trial court should instead grant an extension up to 180 days due to extraordinary circumstances caused by COVID-19. F.M.'s counsel acknowledged that if a new trial occurred, F.M. could be in her office to allow side by side representation. The referring court denied F.M.'s request to modify the

5

associate judge's order.

**B.    Evidence at Trial**

Even though we are deciding this case on its due process issue, we lay out the evidence presented at trial in order to show the extent of the evidence presented.[7]

In October 2018, Texas Department of Family and Protective Services (Department) investigator Luis Almaraz received a report of neglectful supervision and physical neglect of the children by their mother, F.M.[8] According to the report, M.A.M., age twelve, was left to care for K.A.M., age eleven, and J.I.M.P., age three. The report further alleged the home was "dirty and inappropriate for the children." Almaraz received two additional reports, one in November for physical neglect and another in December for physical abuse. The physical neglect report was due to a pending eviction while the physical abuse report was because A.M.M. stabbed her brother, M.A.M., in the face and back with a pencil and was arrested.

According to Almaraz, the seven-member family was living in a one-bedroom trailer with "lots of animals inside" and the home was dirty. Further, the home had holes

---

[7] On day one of trial, the Department put on testimony from Luis Almaraz, Reyes Olivarez, Venansio Castillo, Cheryl Lucero, Pedro Rangel, and Martina Gonzalez prior to an interpreter being made available. The interpreter was present for Elizabeth Garcia and Armida Meza's testimony.

On day two, Amy Quintero, Cristina Garzoria, and Maria Guadalupe Hernandez testified prior to the interpreter being available. The interpreter was brought in for Department witness, Eloina Patricia Sanchez Sixto, and F.M.

On day three, the interpreter was present but released due to F.M.'s confusion about when the proceedings were to begin. The Department put on testimony from Joanna Granado, and the interpreter logged back in halfway through her testimony. The interpreter was present for the remainder of Granado's testimony, the remainder of F.M.'s testimony, Angela Nix, and the closing arguments.

[8] The children's fathers are not parties to this appeal. Accordingly, our review focuses on F.M. and the children. No fathers were parties to the initial reports or investigations.

in the floor and the windows to the trailer were broken and boarded up. The home also did not have electricity—the family received electricity by running an extension cord from the neighbor's home. The affidavit in support of removal described the home as "deplorable," and "reek[ing] of 'filth and feces.'" Although F.M. and her six children shared one bed, Almaraz observed the bed and bedroom to be clean. F.M. subsequently moved to a two-bedroom home that Almaraz described as "better than the other home" because F.M. kept it clean. F.M. told Almaraz that she had attempted to take A.M.M. and M.A.M. for mental health treatment, but M.A.M. kept refusing, so she would reschedule their appointments and they ultimately did not receive care.

In addition to the three previous reports, Almaraz learned that the children missed a lot of school and "school personnel voiced [concern regarding] the hygiene for the children." Almaraz noted that F.M. had eleven or twelve past investigations, five of which were referred to family-based safety services (FBSS) and three of which led to the removal of the children from the home. Among the reports was a report of medical neglect in 2005, but the investigation could not be completed "as the family had moved to Mexico." In 2007, the children were removed because F.M. was in a mental health facility and unable to care for her children. In 2010, the children were observed to be in the street unsupervised, which led to a removal. In 2013, F.M. was referred to FBSS for neglectful supervision for leaving the children alone and concerns that there was not sufficient food in the home. The third removal for neglectful supervision occurred in 2016 when the children were again left unsupervised. Finally, in 2017, F.M. was again referred to FBSS. There were several other investigations in "which there was not a preponderance of the

evidence [of neglect or abuse] and the family was not involved with the Department." Each prior removal ultimately resulted in the children being returned to F.M. Almaraz's 2018 investigation ended in a referral to FBSS.

Pedro Rangel, an FBSS worker with the Department, was assigned to F.M.'s case on January 23, 2019. Rangel contacted F.M. and the children on February 4, 2019. Rangel developed a service plan that included a mental health evaluation, parenting classes, individual counseling, and a psychosocial evaluation. Rangel attempted to contact F.M. later in February but was unable to locate F.M. or the children. The Department finally contacted the family on March 7 and learned they had been evicted and moved to a new home with family friends, Mercedes "Meche" and Juanita Giron. F.M. told Rangel that she was evicted because she could not afford rent. Rangel assessed the new home and found it to be dirty, have holes in the walls and ceiling, and the children rotated between sharing a single bed and sleeping on cushions on the floor.

Rangel testified that he made several visits to the home but F.M. was not there each time. On April 11, F.M. expressed that she was willing to begin services. Rangel stated thereafter when he would go to the home to meet with F.M., she was again not there, and Juanita was left caring for the children. On July 10, Rangel learned that F.M. was working for a shrimp company out of town, though he was unable to confirm the employment. At this time, K.A.M., who was twelve years old, could not be located. Juanita told Rangel that F.M. had taken K.A.M. with her, but K.A.M. was found living with another family friend of F.M.[9] When she was located, K.A.M. stated the reason she left was

---

[9] The date that K.A.M. began residing with her friend is unclear from the record.

8

because A.M.M. reported Meche had touched her inappropriately several times in the past, and she did not want that to happen to her. Rangel interviewed A.M.M. who reported Meche touched her on her breasts, butt, and vaginal area on three separate occasions. A.M.M. reported to Rangel that she had told F.M. about the inappropriate touching.

Rangel testified that F.M. was arrested for burglary of a building on July 14, 2019, and remained in jail at the time of removal. Further, A.M.M. was with F.M. during the offense and was also arrested. F.M. told Rangel she was aware of the allegations against Meche but did not report them because she was afraid the children would be removed from her. The Department sought emergency removal of the children on July 18, 2019. J.I.M.P. was originally not included in the removal because he was living with his biological father at the time. However, after the children were removed, A.M.M. made an additional outcry that J.I.M.P.'s father had also sexually abused her in the past. The Department sought removal of J.I.M.P. later in the day.

Armida Meza, with Affinity Community Services, monitored seventeen visits between F.M. and her children. Meza testified that F.M. "no[-]show[ed]" for two in-person visits and five virtual visits. According to Meza, the children were excited to see their mother at the beginning of the visits, but J.I.M.P. did not react to her much. Meza noted that when the children misbehaved, M.A.M. would attempt to redirect their behavior rather than F.M. During the visits, the children expressed their desire to return to their mother and were sad when the visits would end.[10]

---

[10] Meza noted that during the visits, there were times that she had to remind the children to speak Spanish instead of English so F.M. could understand what they were saying.

Venansio Castillo, a licensed professional counselor, provided counseling and therapy services to F.M. and the children as part of the family service plan. Castillo testified that F.M. was referred to him in January 2020, but there was a delay in the initiation of services because F.M. was incarcerated. F.M. was initially ordered to complete six individual sessions, which she completed on July 6, 2020. The primary focus of the sessions was helping F.M. to make better decisions to provide a safe environment for her children; they also discussed F.M.'s history with relationships involving domestic violence. Castillo also initiated family counseling sessions for F.M. and her children, which began on August 7, 2020. Castillo recommended a minimum of six sessions, but they were delayed due to COVID-19. The children expressed their desire to have a stable home environment to Castillo, but he believed F.M.'s continued instability would have a detrimental effect on the children. The children also expressed to him they did not want to lose contact with their mother but understood her situation and were "okay" if termination occurred. Castillo expressed that F.M.'s conduct in the past has placed the children in "situations where possibly there [was] danger" and that "it would be somewhat unsafe" for them to return to F.M. However, he acknowledged that if F.M. had a stable home and was financially stable enough "to provide for the children's basic needs," then his opinion may differ.

Cheryl Lucero, a clinical therapist, provided therapy to J.I.M.P. Lucero testified that J.I.M.P. referred to his stepmother as "mom" and to F.M. as "[A.M.M.]'s mom." Although J.I.M.P. originally expressed continued desires to live with his father and stepmother, in his last two sessions he expressed the desire to live with "[A.M.M.]'s mother." Lucero

expressed some concern because when she asked J.I.M.P. about F.M., J.I.M.P. had no recollection of her as opposed to having a much better recollection of his stepmother. Lucero testified that she did not believe terminating the parent-child relationship between F.M. and J.I.M.P. would cause him any emotional harm, but that terminating the relationship between J.I.M.P. and his father would. Lucero further testified that J.I.M.P. did not have much of a relationship with his maternal siblings but did speak often of his paternal siblings.

Cristina Garzoria began fostering A.M.M. and J.I.M.P. in August 2019. Garzoria also testified that J.I.M.P. referred to his stepmother as his mother and to F.M. as "[A.M.M.]'s mother" and would refuse to talk to F.M. during scheduled phone visits. In contrast, J.I.M.P. was very engaged with his stepmother and paternal siblings during their phone calls. Garzoria explained that although A.M.M. was in the seventh grade when she arrived, an assessment showed her to have a third-grade level in math and reading; A.M.M. was subsequently diagnosed with dyslexia. However, at the time of trial, A.M.M. had advanced into the ninth grade and was enrolled in the cosmetology program at her school. A.M.M. was also diagnosed as being prediabetic. When asked if she was willing to adopt A.M.M. and J.I.M.P., Garzoria stated "[she was] not sure about that" because "[her and her husband] have had nothing but bad experiences with [F.M.] and it worries [them]."[11]

---

[11] Garzoria at one point explained that F.M. got upset with her on a call because J.I.M.P. was crying and Garzoria was speaking to him in English. A.M.M. had to explain to F.M. what Garzoria was saying because F.M. did not understand.

Maria Hernandez began fostering M.A.M., K.A.M., J.G.M., and J.E.M. in late June 2020. Hernandez testified that K.A.M. expressed to Hernandez that she was "okay" if the parent-child relationship was terminated between her and F.M. because "it's better for her and for her siblings." Although he originally expressed his desire to remain with his mother, M.A.M. eventually told Hernandez that "whatever happened, he was okay with it." According to Hernandez, K.A.M. said the reason the children missed so much school is because they "didn't have what they needed" like clean clothes, so they were "embarrassed to go." Hernandez said J.G.M. and J.E.M., ages eleven and eight respectively, did not talk about school or their desires regarding their mother.

J.I.M.P.'s stepmother, E.P.S.S., testified that she was interested in long-term placement of J.I.M.P. E.P.S.S. maintained contact with J.I.M.P. while he was in foster care, despite J.I.M.P.'s father being in prison for drug possession. E.P.S.S. is also the mother to J.I.M.P.'s three paternal siblings. E.P.S.S. agreed to continue visits with J.I.M.P.'s maternal siblings should he be placed with her.

F.M. testified that she and the children left the first residence because "[the Department was] going to take [her] kids away" if she stayed. F.M. acknowledged that she was arrested for stealing clothes, though she denied that A.M.M. was with her at the time. When asked about A.M.M.'s outcries about Meche, F.M. responded that "[s]he was not abused . . . [s]he was just disrespected." However, F.M. acknowledged that she was aware A.M.M. made allegations of sexual abuse. F.M. testified that she would leave the children with the Girons during the week while she worked out of town because the

12

children had nowhere to go.

F.M. was released from jail on December 13, 2019, but did not begin her services until January or February of 2020. At the time of trial, F.M. was living with an acquaintance, had been working for four to six weeks as a provider earning approximately $300 per week, and was on a waiting list for housing. During the pendency of the case, F.M. worked at a hotel, a laundromat, and various restaurants for about two weeks each, with various reasons for leaving each job. When asked about her future plans for the children, F.M. said "before it was their behavior, but well, [M.A.M.]'s behavior has improved and it's just to live better and as a family." F.M. was aware that A.M.M. was prediabetic; when asked what steps were taken to prevent diabetes, F.M. responded "[i]t's because she would eat a lot of sweets and a lot of greasy food." F.M. testified that she pleaded guilty to misdemeanor theft on the burglary of a building charge.

Joanna Granado was the Department's conservatorship worker for F.M. Granado testified that F.M. was ordered to complete individual and family therapy, a psychological evaluation, a substance abuse assessment and, if necessary, substance abuse treatment, random drug testing, parenting classes, visitation with the children, and pay $5 per month in child support. Granado further testified that F.M. completed her individual counseling, and the psychological evaluation, which recommended a psychiatric evaluation and psychotherapy, but she did not complete the treatments as recommended. One of the services offered by Tropical Texas Behavioral Health (Tropical Texas) included a program to assist individuals in obtaining housing, but F.M. did not fully engage the service. According to Granado, F.M. completed the parenting classes but did not

13

complete family therapy. F.M. did not pay the court-ordered child support. Granado testified that out of the thirty possible visits, F.M. made nineteen and would frequently appear late to the virtual visits or terminate the visits early. To assist F.M. in completing services, the Department offered her transportation. Granado said she even gave F.M. some of her own money to buy food. Lastly, Granado testified that A.M.M. expressed to Granado that she wanted to return to her mother and recanted her allegations against J.I.M.P.'s father.

Angela Nix, guardian ad litem for the children, testified that she believed termination of the parent-child relationship was in the best interest for each child.

Following the termination and the district court's denial of the request for de novo review, F.M. filed this appeal.

## II.    DUE PROCESS

Although F.M. raised multiple issues on appeal, we first must address her due process claims. She argues that her due process rights were violated when (1) trial court failed to have an interpreter present and available during the entirety of her trial; and (2) her trial proceeded through Zoom, instead of in-person, which deprived her of access to her counsel.

The United States Supreme Court held in *Santosky v. Kramer* that "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *In re J.F.C.*, 96 S.W.3d 256, 273 (Tex. 2002) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)). Even though parental termination cases are not criminal in nature, "constitutional rights were at stake: the natural right of a

14

parent to the care, custody, and control of her children involves fundamental constitutional rights." *M.M.V. v. Tex. Dep't of Fam. & Prot. Serv's*, 455 S.W.3d 186, 189–90 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)). "Accordingly, as in the criminal law context, litigants in civil proceedings to terminate parental rights are entitled to an interpreter." *M.M.V.*, 455 S.W.3d at 190; *Castro v. Ayala*, 511 S.W.3d 42, 47 (Tex. App.—El Paso 2014, no pet.). The right to an interpreter is a matter of due process." *M.M.V.*, 455 S.W.3d at 190; *In re L.M.I.*, 117 S.W.3d 1, 4 (Tex. App.—Houston [14th Dist.] 2001), *aff'd*, 119 S.W.3d 707 (Tex. 2003).

"[D]ue process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 377 (1971). Parents have a fundamental interest "in the care, custody, and management of their child." *Santosky*, 455 U.S. at 753.

"In analyzing a claim of deprivation of procedural due process, we determine: (1) whether the complaining party has a liberty or property interest entitled to protection; and (2) if so, what process is due." *In re L.N.C.*, 573 S.W.3d 309, 322 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd); *In re A.J.*, 559 S.W.3d 713, 719 (Tex. App.—Tyler 2018, no pet.). "At a minimum, due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "What process is due in any given situation is measured by a flexible standard that depends on the practical requirements of the circumstances." *In re A.J.,* 559 S.W.3d at 720 (citing *Eldridge*, 424 U.S. at 334). To assess what process F.M. was due, we weigh

15

the three factors laid out by the United States Supreme Court in *Eldridge*:

> (1) the private interest affected by the proceeding or official action;
>
> (2) the countervailing government interest supporting use of the challenged proceeding; and
>
> (3) the risk of an erroneous deprivation of that interest due to the procedures used.

*Id.* at 335; *In re B.L.D.*, 113 S.W.3d 340, 352 (Tex. 2003); *In re A.J.*, 559 S.W.3d at 720.

"In a parental termination case, the private interest affected is the right of a parent to raise his or her child, which is undeniably 'an interest far more precious than any property right.'" *In re J.F.C.*, 96 S.W.3d at 273 (quoting *Santosky*, 455 U.S. at 758–59). "The [United States] Supreme Court has correctly observed that '[w]hen a State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it.'" *Id.* (quoting *Santosky*, 455 U.S. at 759). Thus, the "private interest in a parental termination case is a 'commanding one.'" *Id.* (quoting *Santosky*, 455 U.S. at 759). The "private interests of both the parent and the child in the accuracy and justice of the decision to permanently end their relationship, weighs heavily in favor" of allowing F.M. the opportunity to understand the evidence put forth against her. *In re L.N.C.*, 573 S.W.3d at 322. The first factor weighs in favor of finding that under the circumstances presented here, F.M. did not receive due process. *See id.*

The second factor looks at the Department's interest in protecting the health and safety of the children. *See Eldridge*, 424 U.S. at 333. The Department, parents, and children all have an interest in timely resolution of parental termination cases. *In re J.F.C.*, 96 S.W.3d at 274. Here, the original dismissal date was July 27, 2020, extended to August

16

26, 2020, following the thirty-day extension by the trial court. *See* TEX. FAM. CODE ANN. § 263.401(a); *Seventeenth Emergency Order Regarding COVID-19 State of Disaster*, 609 S.W.3d 119, 120 (Tex. 2020). Although the Department was up against its deadline, that does not allow a violation of F.M.'s due process rights. The trial court began the trial on August 25, 2020, and proceeded to hear from six witnesses prior to an interpreter being brought in. An interpreter was available to the trial court on August 25, 2020, but just not at the time the court wished to begin its trial. Following that date, the trial court reset day two of the termination trial for a week later on September 1, 2020. F.M. had made the trial court aware of her inability to understand the English language on day one of trial and yet still, no interpreter was made available until three of the Department's witnesses had already testified. Additionally, that interpreter was available when the Department wished to call a witness that only spoke the Spanish language. On day three of the trial, September 3, 2020, F.M. was not present when the trial court wished to start due to a misunderstanding about what time the proceeding was beginning,[12] and the trial court released the interpreter who was present, and continued with the Department's next witness. The interpreter logged back in halfway through the Department witness's testimony. Once the trial commenced, the Department's deadline issue was rectified.

Although the dissent expresses concern with the Department's ability to meet its deadline, we cannot allow a deadline to be the reason to violate a parent's rights. It places

---

[12] The trial court called the case at 8:36 a.m. F.M. was not present because, according to her counsel, she thought they were beginning at 9:00 a.m. F.M.'s counsel asked if another witness could be called since F.M. was still on the witness stand from day two. F.M. logged in at 8:54 a.m. The interpreter logged back in at 9:22 a.m.

17

the blame on F.M. for not filing a motion requesting an interpreter, although a motion is not required by the code. *See* TEX. GOV'T CODE ANN. § 57.002(a), (b). The Department was aware of its deadline, and chose to have the trial set one day prior to its expiration.[13] The Department's fundamental interest is in protecting children's health and safety, yet the children in this case were all in alternate housing, not placed with F.M. This was also not the Department's first interaction with F.M. For the dissent to say that the Department was "surprised" that F.M. needed an interpreter and had a strict deadline to keep, which had already been moved once, does not provide a valid reason to violate due process rights. *See In re L.N.C.*, 573 S.W.3d at 323 ("The Department's interest in resolving the case in a single day cannot be given more weight than the interests of [appellant] in a just and accurate result.").

The Department argues that since F.M. did not file a motion requesting an interpreter, the provision of an interpreter was discretionary. *See* TEX. GOV'T CODE § 57.002(a), (b).[14] While we agree with the Department that it is the trial court's discretion

---

[13] Once the trial commenced, the Department's deadline was met. Day two and three of the trial were set the following week with no deadline issue. *See* TEX. FAM. CODE ANN. § 263.401(a); *In re R.J.*, 579 S.W.3d 97, 110 (Tex. App.—Houston [1st Dist.] 2019, pet. denied); *In re R.F., Jr.*, No 04-17-00582-CV, 2018 WL 1308542, at *1 (Tex. App.—San Antonio Mar. 14, 2018, no pet.) (mem. op.) (holding trial commenced for the purposes of § 263.401 when parties appeared, made announcements, trial court denied motion for continuance, and a Department witness briefly testified); *In re D.S.*, 455 S.W.3d 750, 753 (Tex. App.—Amarillo 2015, no pet.) (suggesting "commencement of trial" means, at a minimum, that parties have asked to make their respective announcements, and trial court has ascertained whether any preliminary matters need to be considerered).

[14] Texas Government Code § 57.002 states:

(a)     A court shall appoint . . . a licensed court interpreter for an individual who can hear but does not comprehend or communicate in English if a motion for the appointment of an interpreter is filed by a party or requested by a witness in a civil or criminal proceeding in the court.

(b)     A court may, on its own motion, appoint a . . . licensed court interpreter for an individual who can hear but does not comprehend or communicate in English.

to provide an interpreter when no motion is filed, once that determination has been made, it is not an arbitrary decision as to which testimony is interpreted. The determination that F.M. required an interpreter was not disputed by the Department; in fact, some of its witnesses explained that F.M. only spoke Spanish and they communicated with her in Spanish in order for her to understand what was being requested of her.[15] Once the trial court made the decision that an interpreter was necessary–as was the case here–it was not free to arbitrarily provide an interpreter sporadically throughout the trial. Instead, F.M.'s right to due process in this proceeding involving her "fundamental liberty interest"—her right to parent her children—required the presence of an interpreter throughout the proceeding once the trial court determined she needed one. *See in re J.F.C.*, 96 S.W.3d at 273.

The Department also states that "some of the testimony for which [F.M.] did not have an interpreter was not relevant to her case." Our review of the record shows that there were ten witnesses called with no interpreter present and a substantial portion of the evidence presented was in relation to F.M. While we recognize that the Department's interests in protecting the health and safety of the children and proceeding to trial were extremely important, under the circumstances of this case, they did not exceed F.M.'s right to due process. This factor weighs in favor of finding that under the circumstances

---

TEX. GOV'T CODE § 57.002(a), (b).

[15] The dissent's statement that "nothing in the record demonstrates that the Department, the trial court, or other parties had reason to believe F.M. would need an interpreter" is disingenuous. The Department was aware that F.M. only spoke and understood Spanish, as multiple witnesses testified regarding their interactions with F.M. Granado explained that even though the family service plan was in English, she explained the entire plan to F.M. in Spanish so she could understand. There is also no information contained in the record to show the trial court was not aware of F.M.'s ability or inability to understand proceedings in English.

19

presented here, F.M. did not receive due process.

The third factor "the risk of an erroneous deprivation of that interest due to the procedures used," weighs in favor of a violation of due process. *Eldridge*, 424 U.S. at 335. Because the trial court allowed the use of an interpreter for select portions of the trial, but not the entire trial, the procedures used caused the risk of erroneous deprivation. *See id.* Due to the facts and factors listed previously, the trial court was aware of the need for an interpreter from the beginning of the trial, but the trial court nonetheless proceeded forward without one, and brought an interpreter when available. Although the trial court does not control the county availability, it did control its scheduling and could have delayed the trial until later in the day when the interpreter was available. However, it does not mean that because of scheduling conflicts, F.M.'s due process rights can and should be violated. The trial continued on the following week and still no interpreter was present for the entirety of those days. F.M.'s constitutional rights were at stake and we must require "fundamentally fair procedures." *In re J.F.C.*, 96 S.W.3d at 273. To have interpretation for portions of, but not the whole trial, is not fundamentally fair. *See id.* This factor weighs in favor of finding that under the circumstances presented here, F.M. did not receive due process. Therefore, because we find that all of the factors weighed in favor of a finding of a violation of F.M.'s due process.

We sustain F.M.'s first issue.

### III. CONCLUSION

Though unusual, we find the need to respond to the dissent's opening paragraph due to the improper analysis it uses. The statements made and suggestion provided sets

20

a dangerous precedent that this Court cannot allow to be followed.

The analysis and disposition does not amount to "to an absolute right to an interpreter." We merely find that once the trial court determines F.M. or any parent should have access to an interpreter in proceedings where the Department is attempting to terminate their parental rights, access should be for the entire trial, and not pieces of it. The dissent characterizes F.M.'s actions as "delay[ing] until the last minute" to request the assistance of an interpreter where there is no evidence that the trial court was not aware of F.M.'s inability to understand English. We cannot review a case based upon alleged evidence outside the record and this argument is not before this Court.

Additionally, the Department put on evidence of extensive involvement with F.M. and her children, so it is also disingenuous to state that the Department must have been "surprised" at such a request. The Department's own witnesses testified that F.M. only communicated in Spanish.

No person should be denied the fundamental constitutional right to understand proceedings where the Department is trying to terminate their rights to their children. For the dissent to use an improper analysis and go so far outside this appellate record to suggest that "parents in State-initiated termination suits now have a mechanism by which they can win by default: wait until the dismissal date to raise a due process concern and get their children back when jurisdiction expires because the trial could not commence on or before the dismissal date," is unsupported speculation. To state that a mother is playing games and "winning by default" because she requested an interpreter to understand allegations eliminating her parental rights is wrong; exercising consitutuioal rights do not

21

warrant playing a game.

We note that this case was further complicated by the pandemic era in which we are living. F.M. and her attorney were before the trial court via Zoom, each in separate physical locations. To claim that her attorney was available to translate the proceedings for F.M., as well as provide her with adequate representation, places a onerous and undue burden on her lawyer to be both counsel and interpreter. We cannot allow anyone's due process rights to be "trample[d]" when a party simply desires to understand the proceedings before them.

We reverse the decision of the trial court and remand for proceedings consistent with this opinion.[16]

GINA M. BENAVIDES
Justice

Dissenting Memorandum Opinion by Justice Silva.

Delivered and filed on the
15th day of October, 2021.

---

[16] Because the violation of F.M.'s due process rights warrant a new trial, we need not address her other issues. *See* TEX. R. APP. P. 47.1.