**Affirmed and Memorandum Opinion filed May 2, 2024.**



In The

# Fourteenth Court of Appeals

### NO. 14-23-00851-CV

## IN THE INTEREST OF J.E.R.A, J.G.A.B, CHILDREN

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2022-01568J**

## MEMORANDUM OPINION

A mother appeals the trial court's final decree terminating her parental rights to her two youngest children. Her first issue is a "due process" medley–a series of complaints in connection with the denial of her trial-day motion for continuance based on anticipated ineffective assistance of counsel combined with an argument about the shortcomings in the provision of translation/interpretive services. Her second issue is that the evidence at trial was legally and factually insufficient to support the trial court's determination that termination of her parental rights is in the best interests of the two children. We affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## *Removal*

On September 7, 2022, the Texas Department of Family and Protective Services ("the Department") received an intake alleging neglectful supervision by Mother.[1]  Mother tested positive for cocaine when she came into the hospital to deliver a newborn child. In addition, Mother broke an agreement for a friend to watch her children when she fled in the middle of night climbing over a gate and tossed her then two-and-a-half year-old son over the gate to an unknown person. Each child's father was deported to Honduras and Mother refused to provide the fathers' names. Mother stated she had some family in Houston but did not socialize with them after they insisted she have an abortion. Mother stated that her pregnancy was a result of rape and admitted to using drugs because she was raped and to cope with stress.

On September 14, 2022, the Department filed an "Original Petition for Protection of a Child Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship" and sought temporary managing conservatorship of J.E.R.A, the aforementioned two-and-a-half-year-old ("Javier"), a male born in 2020, and J.G.A.B., the aforementioned newborn ("Jetson"), a male born in 2022, due to neglectful supervision of the Children by Mother and admitted drug use by Mother

On October 12, 2022, the court held an adversary hearing and on October 17, 2022, the court signed an order for temporary managing conservatorship. On November 7, 2022, the Department filed a "First Amended Petition for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-

---

[1] We use pseudonyms to refer to appellant, the children, their biological family members, and foster parents. See Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8.

Child Relationship." On February 13, 2023, Child Advocates was appointed as the Guardian ad litem.

*Trial: Pretrial Motions*

Trial commenced on September 5, 2023. Mother and her attorney appeared for trial.

Before hearing testimony, however, the court heard two motions filed by mother's trial counsel–requests to withdraw and for a continuance. In support, Mother's trial counsel stated that communication with her client had deteriorated to the point where she could no longer effectively represent Mother. She reported that communication with her client began to deteriorate a week and a half before trial while Mother's trial counsel was in the hospital and "when the Department changed their goal." She acknowledged, however, the court's concern that she had been representing Mother during the entirety of the case, and that the statutory dismissal date for the suit was less than two weeks later, on September 18, 2023, which did not provide sufficient time for another attorney to prepare.

The court then asked Mother about her communication with her attorney, and Mother stated that her counsel "has never communicated to me during the whole year." Mother said she had not received a phone call for a year and that she came "to court to find out about her to be able to talk to her."

The court noted that Mother and her attorney were present at the most recent hearing on July 18, 2023 when the court advised Mother that she needed to file a statement of indigence if she wanted a court-appointed attorney, which was not done. The court noted as well that Mother and her counsel were also present before the court in April of 2023, and that at no time had either made the request for Mother to have new counsel. Mother's counsel asserted that "it was brought up,"

3

but the judge saw no record of the issue having been raised, and Mother's counsel agreed that no motion had been filed before. The court then ruled that the motion to withdraw was denied.

Mother's trial counsel then orally asked that the trial be continued because she had been in the hospital during the previous two weeks, learned while she was there that the Department changed its goal, and therefore did not have time to prepare. The court noted, however, that counsel was present at a hearing during the previous July when the court notified the parties that it was not approving the Department's previous goal of family reunification. Counsel responded that the goal had not officially changed, however, until she was in the hospital. She informed the court that she would provide ineffective assistance and stated, "I'm standing here with a broken back and in pain.".

Counsel confirmed, however, that she was in contact with Mother during the case up until July of 2023 when Mother left the drug treatment program at Santa Maria. Before that, counsel said she had been corresponding with Mother via email and had "many emails with her where we do have contact," during which time counsel agreed she was able to help Mother with the case. The court noted, too, that counsel was present at every hearing and suggested that the evidence had not changed; that it pertained to "stuff we already did in prior hearings, including the one that you were on July 18 for…." The court denied the requested continuance and proceeded with trial.

*Trial: Evidence*

The court heard testimony from the Department's caseworker, the child advocate, Mother, and the children's foster father.

The first witness was the Department's caseworker, Tenaye Grant, who was

4

assigned to the case on September 23, 2022, shortly after the suit was initiated. She confirmed that the initial report was made to the Department because Mother and Jetson were positive for cocaine when the child was born, and said Mother admitted to using substances throughout her pregnancy, including methamphetamine and cocaine. Grant explained that as a result Jetson was placed in "an emergency high-risk nursery." Grant said that the child appeared to be lethargic.

Grant testified that Mother was in contact with the Department "on and off," and had not been in contact since the beginning of June. Grant continued to try to contact Mother, however, and testified that Mother admitted to purposefully ignoring Grant, though Grant credited Mother's efforts to reach out to Grant via text in the two weeks leading to trial. Grant described Mother as "very hostile and accusatory." Mother sent Grant emails telling Grant to "go to hell," or telling Grant that God would take care of her.

Grant confirmed that both children were placed in foster care and that the placement was an adoptive one. Grant said the children were "very much" bonded with their foster parents.

The child advocate volunteer, Esther Gonzalez, testified next. She was appointed in March, had observed the children in their foster home, and testified that their interaction with their foster parents was "very positive." She testified about Javier's improved health and progress in speech after being placed in foster care.

Mother testified next. She acknowledged that she tested positive for cocaine at Jetson's birth and that she used cocaine throughout the time she was pregnant. She estimated that she used cocaine during her fifth month, stating, "I believe it was like about five, something like that, that month."

Mother said she was in a relationship with Javier's father whom she described as "a very toxic person," who "did not allow me to have a phone…did not allow me to have contact with social media," and said, "I was not allowed to talk to anyone or anybody." She decided to separate from him while they were living in Alabama and said "he tried to take the kid away from me saying that I had suffered from depression." She said he asked one of his sisters to call CPS and to ask them to place the child with him because she was depressed and fought a lot with the child's father. Mother acknowledged that when she and Javier's father fought, "there was [sic] some altercations that were physical." She said that Javier was not present during any episodes of domestic violence, but that Javier's father was physically violent toward her when she was pregnant. She said the Department at that time provided her with therapy and domestic violence classes, which she participated in for about four weeks until she moved to Houston. She said at that point she moved her case to Houston and the prior case was closed.

Mother said the last time she used drugs was about a month before trial, when she used cocaine. She said she knew she could have participated in the drug testing and asked for help, but did not.

With respect to the court-ordered test in July, Mother acknowledged that she was present in court that day but said she did not take the test because she was not doing well mentally. She said, "So, when I heard that what [sic] was going to take place, I started feeling pretty bad. I felt that I couldn't go on. And then my caseworker asked me if I wanted to visit my children. I told him no. I can't control this."

The foster father (referred to also as "Ferdinand") testified last. He said that the children resided with him and his spouse in their four-bedroom home, and they had no other children living with them. They could have the children in separate

rooms, but had them sleeping in the same room because, he said, "it's better…for bonding for them to be in the same room so that they feel protected and together." Ferdinand said he was employed in business development and as an athletic trainer at UT Health Center, and his spouse worked as a real estate agent.

*Final Decree*

Following trial, on October 26, 2023, the trial court signed its final decree of termination of the parental rights of each of the children's parents. With respect to Mother, the decree found that termination was warranted under sections 161.001(b)(1)(a), (E), (O), (P), and (R) of the Texas Family Code. The decree also found that termination was in the best interest of the children. Tex. Fam. Code. 161.001(b)(1).

## II. ISSUES AND ANALYSIS

A court may terminate the parent-child relationship if the court finds by clear and convincing evidence that (1) the parent has engaged in at least one statutory predicate act and (2) termination is in the best interest of the child. *See In re N.G.*, 577 S.W.3d 230 (Tex. 2019); *In Interest of L.G.R.*, 498 S.W.3d 195, 201 (Tex. App.—Houston [14th Dist.] 2016, pet. denied);; *see also* Tex. Fam. Code § 161.001(b). While Mother does not challenge any of the four predicate-act findings made by the trial court trial court, in her second issue, she attacks the trial court's termination decree by challenging the evidence to support its best-interest finding. We first address her due process complaints.

### A. Does Mother present reversible error based on any complained-of due process violation?

Mother's broadly-worded first issue—"Whether appellant's due process rights were violated"—contains two sub-parts. Under the first sub-part, she

complains that the trial court erred and violated a due process right when it denied her motion for a continuance because, as she contends, the ruling effectively "forced her to proceed with ineffective counsel." Under the second sub-part of her due process complaint, she complains that her constitutional rights were violated because she was not provided certain Spanish-speaking accommodations.

**Did the trial court err in denying appellant's motion for continuance?**

We review a trial court's denial of a motion for continuance for an abuse of discretion. *Tran v. Nguyen*, 480 S.W.3d 119, 124–25 (Tex. App.—Houston [14th Dist.] 2015, no pet.). A trial court abuses its discretion when it acts unreasonably or arbitrarily, or without reference to any guiding rules or principles. *Barras v. Barras,* 396 S.W.3d 154, 164 (Tex. App.–Houston [14th Dist.] 2013, pet. denied). We may not substitute our judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *Zagorski v. Zagorski,* 116 S.W.3d 309, 313–14 (Tex. App.–Houston [14th Dist.] 2003, pet. denied).

The record indicates on September 5, 2023, the first day of trial, Mother's counsel filed a half-page written motion for continuance (along with an unsigned motion to withdraw), and orally requested a continuance before the start of trial. The written motion for continuance references Rule 251 and alleges:

1. The attorney client relationship has deteriorated to the point where a new attorney needs to be appointed for the mother.

2. That the continuance is not sought for delay only, but that justice may be done.

3. Wherefore Movant prays the Court to grant this Motion for Continuance.

The motion contains a verification which is electronically signed by

8

Mother's trial counsel but not by a notary.

## VERIFICATION

STATE OF TEXAS          §
COUNTY OF HARRIS        §


     The undersigned states under oath that I am the Attorney for Movant in the foregoing Motion For Continuance and I swear under oath that the above Motion For Continuance is true and correct.

                                 /S/ Stephanie Morales
                                  Stephanie Morales
                                  Attorney for Movant

Subscribed and sworn to before me, the undersigned notary public, on this _____ day of
_____, _____.


                                _____
                                  Notary Public in and for
                                  Harris County, Texas


Prior to starting trial, the trial judge first heard and ruled on Mother's trial counsel's motion to withdraw. Noting the continued appearances of Mother and her trial counsel together at previous hearings, the trial court remarked that this was the first time he was aware of this issue and denied the motion to withdraw.

Mother's counsel then orally moved for continuance. The exchange on this motion was as follows:

> MS. MORALES: Judge, I'm going to do -- still ask for a continuance. I have been in the hospital for the past two weeks. I have not had time to accurately prepare for trial since the State changed their goal.
>
> THE COURT: Well, they changed it in -- it was July. Right?
>
> MS. MORALES: No. They just informed me by e-mail while I was in

9

the hospital that the goal has changed.

THE COURT: Because I'm looking here. You were present on July 18th when I did not approve their goal of family reunification. Correct?

MS. MORALES: Correct. But the goal was officially changed by then while I was in the hospital these last two weeks, Judge. And, because of my medical condition and the fact that I was in the hospital, I have not had the time to accurately prepare for a trial on this case, so it would be appealable immediately if we go forward with that.

THE COURT: Well, I'm not sure it would be. It might be on you.

MS. MORALES: Ineffective assistance of counsel, Judge. I'm telling you right now that's how it's going to go.

THE COURT: So, you've been ineffective the whole last year?

MS. MORALES: I'm current -- right now ineffective. I'm standing here with a broken back and in pain.

THE COURT: My question is, if you've been here every hearing, most of what the evidence is is simply stuff that we already did in prior hearings, including the one that you were here on July 18th for and so, I'm not sure, is it your fault that Mother hasn't been in contact with you?

MS. MORALES: Judge, I mean, if that's what's needed, I will fall on the sword. I have been in the hospital. I currently have a broken back --

THE COURT: Ms. Morales -- Ms. Morales -- all I want you to do is tell the truth. That's all you need to do. It's not falling on the sword. My questions --

MS. MORALES: I have been in the hospital the past two weeks and have not been able to communicate with Mom at all.

THE COURT: Yeah. But you were out of the hospital before that --

MS. MORALES: For a week. Then I was in the hospital --

THE COURT: Let me finish. Ms. Morales, let me finish. So, I'm trying to understand what relationship you had with Mother during the whole case. She's saying it's your fault, which probably would be you dropping below the standard of an attorney, that she has been unable to contact you for the whole case. You're saying that Mother wasn't in

10

contact with you, didn't give you her number and other things. Correct?

MS. MORALES: When she left Santa Maria, Judge, that's when I lost contact with her. I have many e-mails back and forth with her where we do have contact.

THE COURT: When did she leave Santa Maria?

MS. MORALES: In July.

THE COURT: So, you were in contact with her all the way up to July?

MS. MORALES: Correct.

THE COURT: And you were able to help her with the case. Correct?

MS. MORALES: Correct.

THE COURT: So, I'm still denying your motion. And is your motion for continuance based on anything different?

MS. MORALES: I have a motion based on the fact that I have not been able to prepare for trial because I was in the hospital and currently am standing here with a broken back.

THE COURT: Okay. Well, we are going to start the trial today.

Rule 251 of the Texas Rules of Civil Procedure applicable to a continuance motion states:

> No application for a continuance shall be heard before the defendant files his defense, nor shall any continuance be granted except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law.

Tex. R. Civ. P. 251

Whether we were to view the record to contain one combined or two separate motions for continuance, it was (or they were) lacking persuasive support. The written motion for continuance and the oral motion for continuance were based on different grounds. The written motion was based on a communication breakdown between Mother and Mother's trial attorney. The court noted facts that illustrated reasonable communication existed between the two generally, and

11

suggested that the period of alleged lapsed communication was short and uneventful. The oral motion, urged after the trial court had denied the motion to withdraw, was asserted on grounds that Mother's counsel was not prepared to address Department's changed permanency goals, Mother's trial counsel was experiencing physical pain, and that she lacked time to prepare for trial due to recent hospitalization.

The trial court could have reasonably found certain aspects of Mother's trial counsel's oral request unconvincing for reasons uncovered during trial court's questioning of her at the hearing. The trial court could have reasonably discredited the allegation that the Department's changed permanency goal or the court's approval of it presented a surprise. The only ground not dismantled by the trial judge, trial counsel's physical back pain, may have been diminished by the fact, pointed out by counsel, that she was in fact standing in court. Finally, Mother has not shown against the trial record how her counsel's performance could have improved had the motion been granted, nor has mother pointed to any specific evidence she was prevented from presenting. *See Henderson v. State*, No. 14-18-00926-CR, 2020 WL 5834224, at *6 (Tex. App.—Houston [14th Dist.] Oct. 1, 2020, pet. ref'd)(affirming denial of motion for continuance when appellant failed to illustrate the harm—"identify a witness who might have been called to testify, evidence that might have been offered, or information that might have been beneficial to his case"). The trial judge could have reasonably concluded the lack of support offered with the written motion or oral motion were too far at odds with the trial court's expressed concerns prompt resolution as serving "the best interests of the children."

**Does the record contain an adequately preserved and briefed complaint of a constitutional violation concerning the right to any translation or interpretive services?**

We next address the second sub-part of Mother's due process complaint, her complaint that she was deprived of constitutional rights by not being provided certain Spanish-speaking accommodations. The law affords due process protections, including a parent's right to have an affidavit interpreted into a language she understands apply to proceedings to terminate parental rights. *In re L.M.I.,* 117 S.W.3d 1, 4 (Tex. App.—Houston [14th Dist.] 2001), *aff'd,* 119 S.W.3d 707 (Tex. 2003). Mother contends that there was no evidence showing she was ever provided with a Spanish translation of her family service plan, "provided with services or evaluations in Spanish or with interpreters," or that "drug treatment services were in Spanish or whether she was offered assistance with a relapse prevention program in English or Spanish." In its response, the Department argues Mother failed to preserve this issue but also cites various instances in the record where Mother was provided accommodations.

Mother frames the issue as a "no evidence" complaint, and in doing so Mother does not point to (nor can we find) any instance in the record at trial indicating that she ever lodged a request, objection, motion or other complaint in the trial court in connection with her complaint on appeal, i.e., complaining of the lack of Spanish-language services, or lack of translation services beyond those provided to her. *See*, e.g., *Interest of A.M.M.*, No. 13-21-00114-CV, 2021 WL 4819079, at *2 (Tex. App.—Corpus Christi–Edinburg Oct. 15, 2021, no pet.)(illustrating a trial record preserving similar argument). Like most appellate complaints, to preserve such a due process complaint for appeal, Mother was required to first raise the issue in the trial court. Tex. R. App. P. 33.1 (requiring, as a prerequisite to appellate review, that a party present the complaint to the trial court through a timely request, motion, or objection, state the basis for the complaint, and obtain a ruling); *see In re L.M.I.*, 119 S.W.3d at 710–11; *see also In*

13

*re B.L.D.*, 113 S.W.3d 340, 349–55 (Tex. 2003) (discussing preservation of error in termination cases); *see also In Interest of F.E.N.*, 542 S.W.3d 752, 768 (Tex. App.—Houston [14th Dist.] 2018, no pet.)(finding no preservation of due process complaint upon a record that "show[ed] no indication that Father objected to the Department's failure to provide a translator during its interactions with him or the failure to provide a translated family service plan"); *Herrera v. Mata*, No. 09-20-00170-CV, 2022 WL 17002128, at *6 (Tex. App.—Beaumont Nov. 17, 2022, no pet.)(denying a collateral attack on the judgment without record showing trial court denied request to have the documents translated before she signed them); *Perez v. Old Am. Cnty. Mut. Fire Ins. Co.*, No. 14-09-00456-CV, 2010 WL 3168389, at *3 (Tex. App.—Houston [14th Dist.] Aug. 12, 2010, pet. denied)(finding complaint that trial court denied due process rights by failing to appoint a licensed translator). Mother's testimony about the manner in which services were provided to her does not equate to an objection, request or motion. Without any record of a complained-of error by the trial court, we have nothing preserved regarding the provision of translation or interpretive services to review.

Having considered each component of Mother's first issue, we overrule Mother's first issue in its entirety.

**B. Is the trial court's order terminating Mother's parental rights supported by legally and factually sufficient evidence to support the trial court's finding that termination is in the best interests of the children?**

In her second issue, Mother challenges the factual and legal sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship serves the best interests of the children.

Termination of the parent-child relationship is a drastic remedy and is of such weight and gravity that due process requires the state to justify termination by

clear and convincing evidence. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see also In re L.G.R.*, 498 S.W.3d 195, 201 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code § 101.007. This heightened burden of proof results in a heightened standard of review when evaluating the sufficiency of the evidence. *In re L.G.R.*, 498 S.W.3d at 202.

Under a legal sufficiency review, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible, but we do not disregard undisputed facts. *See In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020).

Evidence is factually insufficient if, in light of the entire record, "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *In re J.F.C.*, 96 S.W.3d at 266.

There is a strong presumption that the best interest of the child is served by keeping the child with his natural parents. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). However, prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *In re S.R.*, 452 S.W.3d at 366 (citing Tex. Fam. Code Ann. § 263.307(a)). Proof of acts or omissions under section

161.001(b)(1) is probative of the issue of the child's best interest. *See id*. The considerations that the factfinder may use to determine the best interest of the child, known as the *Holley* factors, include:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future physical and emotional danger to the child;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting the best interest of the children;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (interpreting former Tex. Fam. Code § 15.02 (since amended)); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether the child's parents are willing and able to provide the child with a safe environment").

## Holley *factor (1), Children's Desires*

Mother contends there was no evidence relevant to first *Holley* factors regarding the children's desires, presumably due to their age. However, when children are too young to verbally express their desires, Texas courts permit the fact finder to consider observations of the children's interactions with the parent or foster family, including any perceived "bonding" between the child and parent or caretaker. *See Interest of M.D.*, No. 14-20-00244-CV, 2020 WL 5626273, at *8 (Tex. App.—Houston [14th Dist.] Sept. 21, 2020, no pet.)(finding first *Holley* factor neutral after considering evidence of bonding observed with father during

16

visits and evidence of "a secure attachment to Foster Parents").

The Department's caseworker Tenaye Grant testified that the two boys were "very much" bonded to their foster parents. Grant observed that Javier never cried at the end of his visits with Mother and was instead"always excited to go back home." She testified that there had been no negative impact on either child after Mother's visits were suspended, and she had not seen Javier ask for Mother. Gonzalez also testified that the children were "very bonded" to their foster caregivers and described the relationship as "very loving." She said that Mother's visits went well and the children seemed happy to see Mother but had not asked about her since the visits stopped, three months before. Like Grant, Gonzalez did not believe that stopping the children's contact with Mother had affected the children in any way and she had not observed that the children were upset not to see their mother.

Thus, the testimony at trial concerning the first *Holley* factor provides neutral to some weight on the scale favoring termination of Mother's parental rights is in the children's the best-interest.

Holley *factor (2), The current and future emotional and physical needs of the child*

Mother does not address any evidence adduced relevant to the second *Holley* factor, though the record contains relevant testimony reflecting Mother's reluctance to direct attention towards Jetson and pattern of misfeeding Javier. Grant testified that during visits, Mother appeared fidgety, was "possibly…under the influence," and failed to pay close attention to Jetson. Ferdinand testified that they sent a journal with the children to their visits with Mother to give Mother weekly updates about the children. He explained they received little response back from Mother and what responses they did receive were all about Javier. Later, during the Safe Babies program visits, Ferdinand noted that Mother "preferred

17

[Javier] over [Jetson]," and the foster fathers spent most of the time holding Jetson during those visits.

Grant testified that during the visits Mother continued to overfeed Javier and did not follow any recommendations about appropriate meals for the child. The Safe Babies program, Grant said, assisted Mother with proper feeding and demonstrated healthy alternatives and options for food for the children. However, Mother continued to demonstrate the same patterns of behavior before those services were provided. Ferdinand testified that, during the Safe Babies program, he and his spouse showed Mother what they fed the child and communicated to her about managing the child's weight during each of the five visits they shared with Mother. However, Ferdinand said Mother failed to follow their advice and on one subsequent visit brought Javier "two ten-piece chicken McNugget meals with a large fry and a large Coke…for his dinner."

This evidence supported the conclusion, therefore, that Mother proved unable to change her behavior in order to meet the children's needs, while the foster caregivers made significant efforts demonstrating a commitment and ability to care for the children and support their ongoing well-being. Moreover, foster parents proved capable of addressing the children's unique vulnerabilities and special needs.

A fact finder may infer from a parent's past inability to meet the child's physical and emotional needs that the parent is unable or unwilling to meet the child's needs in the future. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Evidence of a parent's unstable lifestyle can support a factfinder's conclusion that termination of parental rights is in the child's best interest. *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Lack of stability, including a stable home, supports a finding that the parent

is unable to provide for a child's emotional and physical needs. *See In re G.M.G.*, 444 S.W.3d 46, 59–60 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied) (parent's failure to provide stable home and provide for child's needs may contribute to finding that termination of parental rights is in child's best interest).

Accordingly, our consideration of the trial evidence relevant to the second *Holley* factor weighs in favor of terminating Mother's parental rights.

Holley *factor (3), The current and future physical danger to the child*

A parent's drug use supports a positive finding on the third *Holley* factor that termination is in the best interest of the child. *Interest of D.M.M.*, No. 14-18-00750-CV, 2019 WL 546029, at *8 (Tex. App.—Houston [14th Dist.] Feb. 12, 2019, pet. denied). The factfinder can give "great weight" to the "significant factor" of drug-related conduct. *In re K.C., 219 S.W.3d 924*, 927 (Tex. App.–Dallas 2007, no pet.); *see also, In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591, at *6 (Tex. App. Houston [14th Dist. 2019, pet. denied) ("Drug abuse and its effect on the ability to parent can present an endangering course of conduct."). Moreover, a mother's use of drugs during pregnancy is considered endangering conduct to be evaluated in determining the best interest of a child. *In re I.R.*, No. 14-14-00626-CV, 2014 WL 6854747, at *8 (Tex. App.—Houston [14th Dist.] Dec. 4, 2014, no pet.).

Several witnesses, including Mother, confirmed that Mother had used cocaine and methamphetamines during her pregnancy with Jetson. Ferdinand testified that when Jetson was initially placed in his home the child showed signs of substance abuse. Jetson "had jitters," his arms were "shaky and jittery," and had one episode in which he became unresponsive and had to be taken to the

emergency room. Even if we presume without concluding that mother's drug use had no long-term effects on Jetson, the record at least provides some evidence that Mother's drug use brought about unintended harm to her child.

Moreover, the record shows Mother continued to use illegal drugs during the suit despite the services provided her to address that conduct and her sporadic cooperation. Although Mother enrolled and successfully participated in in-patient substance abuse treatment and completed that treatment in March of 2023, she admitted at trial that she relapsed during the following April when she used cocaine with her roommate. And although she re-entered treatment for 30 days, she left the program, refused to return, and thereafter refused to participate in further drug testing requested by the Department. She told Grant that, "she tested enough." Grant testified that during the three months leading to trial, Mother had missed multiple tests, including testing ordered by the court in July, and that her visits with the children were suspended as a result. Mother admitted she last used cocaine one month before trial.

Mother's positive drug test results and refusals to test are also supportive of the court's consideration of present and future physical and emotional dangers to the child. See *In re I.W.*, 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (stating a parent's "refusal to submit to [a] drug test may be treated by the trial court as if he had tested positive for drugs.").

Because the record contains evidence showing the possibility that Mother's drug problem would persist and thus present a future emotional danger to Javier and Jetson, the third *Holley* factor supports the trial court's best-interest finding.

*Holley factors (4) and (6), The parental abilities of the person seeking custody and plans for the child by the person seeking custody*

Mother had two other children living in Honduras for whom she failed to provide any evidence of her ability to parent. *Interest of L.A.V.*, No. 14-21-00430-CV, 2022 WL 969576, at *11 (Tex. App.—Houston [14th Dist.] Mar. 31, 2022, pet. denied)(finding probative lack of record concerning abilities to parent other children). Mother also failed to display essential parenting behavior of self-control during the pendency of the case. Gonzalez testified that Mother reported taking medication to treat her mental health but nonetheless continued to make suicidal statements and "blames all of us for her mental health and [said] she will hurt herself if she cannot get her children back." Opportunities to visit Javier and Jetson were lost when Mother elected to discontinue participation in the family service plan. Mother acknowledged her difficulties with her mental health. When asked why she refused to take the court ordered drug test in July of 2023, she said she was "not doing well… mentally," was "feeling pretty bad," and "that I couldn't go on…." Any plans for Mother to have custody would necessarily begin with Mother committing herself to long-term recovery.

At trial Mother testified that one of her sisters ("maternal aunt") was willing to adopt the two boys and that she wanted them placed with her if the department chose not to place them with Mother. However, Grant testified that the Department had concerns regarding the maternal relatives because they initially declined taking placement of the children when the suit began and it was not until June of 2023, nine months later, that they asked to be considered as possible caregivers. The Department performed a home study on the maternal aunt but was unable to conduct background checks on some of the household members—Mother's father and her younger sister—because they lacked government identification. On appeal Mother takes issue with the Department's efforts to evaluate her sister's home, and

21

suggests the department has discriminated based on their immigration status or used their status as a basis for not conducting further investigation. However, Grant explained she was unsure how to proceed when she was unable to gather necessary information due to the residents' lack of identification, which is not inherently tied to immigration status. Mother testified that the household members were working to provide the Department with the identification on the day of trial; that her father had provided a passport and her younger sister was contemporaneously at the Honduras consulate attempting to secure those documents.

Notwithstanding the incomplete background checks, the record contains other evidence supporting the Department's reluctance to place the boys with the maternal aunt–specifically, expressing concerns with the sleeping arrangements where the boys would sleep with one adult and another child, and lacked proof that anyone in the household, in the absence of driver's license, could legally transport the children.

Both foster parents were employed and lived in a four-bedroom home. Ferdinand testified that he and his spouse had good support systems, and that relatives and family friends visited regularly. He testified that their home could accommodate the children in separate rooms, but at the time had them sleeping in the same room because, he said, "it's better…for bonding for them to be in the same room so that they feel protected and together." No evidence suggested any adults slept in the same room. They had enrolled the children in a bilingual daycare, signed Javier up for soccer, and planned to involve Jetson in similar activities. Ferdinand testified that he and his spouse loved the children, wished to support them "in any way," and "would love for them to remain a part of our family." He said they wished to provide the children with what whatever they

chose "in regards to education or post high-school or whatever trade school…," and "we are a hundred percent behind them and will continue to be behind them." He also said they felt it was important for the children to continue to have contact with their biological family and would "absolutely" consider maintaining the children's relationship with Mother if she "were to get on the right track." The foster parents were able to provide the children with the physical and emotional stability Mother lacked, and had plans for the children's future care, and wished to adopt the two boys.

Evidence pertinent to the fourth and sixth *Holley* factors weighs heavily in favor of terminating Mother's parental rights.

### Holley *factor (5), Programs available to assist the person seeking custody in promoting the best interest of the child.*

Mother contends there was no evidence relevant to the fifth *Holley* factor regarding any programs available to assist in promoting the children's best interest. The Department has not taken exception. We note that the record shows both mother and foster family participated in sessions in a program called "Save Babies" program. Our consideration of evidence pertinent to this factor is neutral.

### Holley *factor (7), Stability of the home*

From the time the termination suit began and throughout its pendency, Mother lacked stable housing or employment. When the Department investigated the initial report which brought the children into its care, Mother reported that she was unemployed and living in an apartment left for her by her sister's ex-boyfriend who was living out of the country. She had little family support as most of her family lived in Honduras, and she said she did not interact with her family members who lived in Houston because they did not want her to give birth to Javier. Mother's family service plan confirmed that Mother admitted to not having

23

employment or stable housing, nor any way to support her children. Mother was provided with a residence as part of her in-patient substance abuse treatment program, and lived there from September of 2022 until she relapsed and chose to leave on May 31, 2023. Shortly thereafter, the evidence shows she was again unemployed and lacked stable housing. She reported during her psychiatric evaluation in June of 2023 that she was unemployed and living in an apartment "through housing." The Child Advocate report detailed Mother's account that after she left treatment, she was again living in an apartment provided by her brother-in-law. As of August 2023, shortly before trial, she reported that she had her own residence, and told Grant that she was also employed. However, she failed to provide proof of either, as was required by her family service plan. Both Grant and Gonzalez testified at trial that they asked Mother for proof of her housing and employment, but neither received anything in return. Grant testified that she asked Mother for "anything" showing she was employed, including an email address or contact information for the employer because she understood that Mother was being paid "under the books." However, Mother never provided proof of either.

Accordingly, evidence implicating the seventh factor suggests that termination of Mother's parental rights supports the best-interest finding.

*Holley factors (8) and (9), Acts or omissions of the parent that may indicate that the parent- child relationship is improper, and any excuses for such acts or omissions.*

Evidence supporting termination under the grounds listed in section 161.001(b)(1) also can be considered in support of a finding that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest). Specifically, here the trial court could properly consider that Mother did not comply with the court-ordered service plan for reunification with the child. *See In*

24

*re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). The record firmly established Mother's failure to complete her family service plan, a finding uncontested by Mother in this appeal.

Mother's failure to complete the family service plan, supported in part by the evidence of Mother's relapse, her admitted refusal to engage with the Department at times, and testimony describing Mother's suicidal comments since her relapse leading up to trial, lend support to the conclusion that Mother, having not yet proven an ability to address her own issues, would be challenged to provide a proper parent-child relationship.

In light of these considerations, we conclude evidence implicating the eighth and ninth factors show that termination of Mother's parental rights support the best-interest finding.

### *Summary of* Holley *Analysis*

Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Mother's parental rights is in Javier and Jetson's best interest. *See Interest of D.M.M.*, 2019 WL 546029, at *8; *In re E.C.R.*, 402 S.W.3d at 249; *See In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.–Fort Worth 2006, no pet.) (considering the parent's drug use, inability to provide a stable home, and failure to comply with a family-service plan in holding the evidence supported the best-interest finding). Based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's rights served the children's best interests so that they quickly could achieve permanency through adoption. *See In re T.G.R.–M.*, 404 S.W.3d 7, 17 (Tex. App.–Houston [1st Dist.] 2013, no pet.); *M.G.D.*, 108 S.W.3d at 513–14.

## III. CONCLUSION

Having overruled each of the issues presented, we affirm the trial court's judgment terminating Mother's parental rights to Javier and Jetson.


/s/     Randy Wilson
        Justice

Panel consists of Chief Justice Christopher and Justices Zimmerer and Wilson.